**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 15-1419

KOBE; MARK,

           Plaintiffs – Appellants,

      and

JOHN,

           Plaintiff,

      v.

NIKKI HALEY, in her official capacity as Governor and Chairman of the South Carolina Budget and Control Board; CHRISTIAN SOURA, in his capacity as the Director of the South Carolina Department of Health and Human Services: ANTHONY KECK, in his capacity as the former Director of the South Carolina Department of Health and Human Services; BEVERLY BUSCEMI, in her official capacity as Director of the South Carolina Department of Disabilities and Special Needs; RICHARD HUNTRESS, in his capacity as Commissioner of the South Carolina Department of Disabilities and Special Needs; KATHI LACY; THOMAS P. WARING; JACOB CHOREY, in their capacities as employees of the South Carolina Department of Disabilities and Special Needs; MARY LEITNER, in her capacity as the Director of the Richland Lexington Disabilities and Special Needs Board; JUDY JOHNSON, in her capacity as the Director of the Babcock Center; DANIEL COOPER; CONVERSE A. CHELLIS, III, HUGH LEATHERMAN; RICHARD ECKSTROM; CURTIS LOFTIS; BRIAN WHITE, in their capacities as former members of the South Carolina Budget and Control Board; EMMA FORKNER, in her capacity as the former Director of the South Carolina Department of Health and Human Services; EUGENE A. LAURENT, former Interim Director of the South Carolina Department of Disabilities and Special Needs; STANLEY BUTKUS, former Director of the South Carolina Department of Disabilities and Special Needs;

UNNAMED ACTORS ASSOCIATED WITH THE BABCOCK CENTER; THE BABCOCK CENTER,

Defendants – Appellees,

and

CYNTHIA MANN, Deputy Administrator and Director of the Center for Medicaid, CHIP, and Survey & Certification, CMS; ELEANOR KITZMAN, in her official capacity as the Executive Director of the State Budget and Control Board; MCCONNELL F. GLENN, in his official capacity as the President Pro Tempore of the South Carolina Senate; ROBERT W. HARRELL, JR., in his official capacity as the Speaker of the South Carolina House of Representatives; MARK SANFORD, in his capacity as a former member of the South Carolina Budget and Control Board,

Defendants.

—————————

Appeal from the United States District Court for the District of South Carolina, at Columbia. Margaret B. Seymour, Senior District Judge. (3:11-cv-01146-MBS)

—————————

Argued: September 22, 2016          Decided: December 15, 2016

—————————

Before TRAXLER, DIAZ, and THACKER, Circuit Judges.

—————————

Affirmed in part, vacated in part, and remanded by unpublished per curiam opinion.

—————————

**ARGUED:** Patricia L. Harrison, PATRICIA LOGAN HARRISON LAW OFFICE, Columbia, South Carolina, for Appellants. Damon C. Wlodarczyk, RILEY, POPE & LANEY, LLC, Columbia, South Carolina; Vance J. Bettis, GIGNILLIAT, SAVITZ & BETTIS, Columbia, South Carolina, for Appellees. **ON BRIEF:** William H. Davidson, II, Kenneth P. Woodington, DAVIDSON & LINDEMANN, P.A., Columbia, South Carolina, for Appellees Buscemi, Butkus, Chorey, Huntress, Lacy, Laurent & Waring. Patrick J. Frawley, DAVIS FRAWLEY, LLC, Lexington, South Carolina, for Appellee Leitner. Joel W. Collins, Jr., Christian Stegmaier, Meghan Hazelwood Hall,

2

COLLINS & LACY, P.C., Columbia, South Carolina, for Appellees Babcock Center, Unnamed Actors Associated with the Babcock Center & Johnson. Robin L. Jackson, SENN LEGAL, LLC, Charleston, South Carolina, for Appellees Chellis & Cooper. Leslie A. Cotter, Jr., Sheila M. Bias, RICHARDSON, PLOWDEN & ROBINSON, P.A., Columbia, South Carolina, for Appellees Leatherman & Eckstrom.

_____

Unpublished opinions are not binding precedent in this circuit.

PER CURIAM:

"Kobe" and "Mark" ("Appellants")[1] appeal district court orders dismissing certain defendants and then granting summary judgment to others in an action primarily pertaining to the administration of a South Carolina Medicaid waiver program. Because we conclude that the district court erred in determining that no justiciable issues remain in this case, we vacate the grant of summary judgment against Appellants on Counts One through Seven. We also vacate the dismissal of Counts One and Two against Governor Nikki Haley in her official capacity. Otherwise, we affirm.

I.

The Medicaid program, 42 U.S.C.A. §§ 1396, 1396a-v, established as part of the Social Security Act in 1965, "is a cooperative federal-state public assistance program that makes federal funds available to states electing to furnish medical services to certain impoverished individuals." Mowbray v. Kozlowski, 914 F.2d 593, 595 (4th Cir. 1990); see also Harris v. McRae, 448 U.S. 297, 301 (1980). The state agency responsible for administering and supervising Medicaid in South Carolina is

---

[1] Appellants are using pseudonyms to protect themselves from possible retaliation.

4

the South Carolina Department of Health and Human Services ("DHHS"). See Doe v. Kidd, 501 F.3d 348, 351 (4th Cir. 2007). DHHS, in turn, contracts with the South Carolina Department of Disabilities and Special Needs ("DDSN") to operate South Carolina's treatment and training programs for people with intellectual and related disabilities. DDSN is a seven-member commission that is appointed by the Governor with the advice and consent of the Senate. DDSN contracts with local Disabilities and Special Needs Boards ("DSN Boards"), which contract with private entities to provide Medicaid services.

The Richland Lexington Disabilities and Special Needs Board ("Rich/Lex") is "the administrative, planning, coordinating, and service delivery body" for DDSN services that are provided in South Carolina's Richland and Lexington Counties. S.C. Code § 44-20-385. It is funded by DDSN and follows DHHS's and DDSN's policies and procedures.

At issue in this case is the Medicaid waiver program created by 42 U.S.C. § 1396n(c), which allows states to waive the requirement that aid recipients must live in an institution to receive particular Medicaid services. This case concerns home and community-based services that South Carolina provides through a Medicaid waiver program for eligible persons with disabilities so that they may live in the community and avoid

5

institutionalization (the "ID/RD waiver").[2]  As is relevant in this case, among the several types of services provided through the ID/RD waiver are Adult Day Health Care services ("ADHC"), respite care, and equipment and assistive technology.  ADHC provides individuals with medical or therapeutic care as well as social and recreational events and meals.  Respite care is "[s]ervice[] provided to individuals unable to care for themselves [that is] furnished on a short-term basis because of the absence or need for relief of those persons normally providing the care."  J.A. 2894.

Administration of the ID/RD waiver services generally involves a service coordinator for each recipient, typically at the county level.  The service coordinator's role is to evaluate the individual's condition and needs, including information from that person's doctors and other medical professionals, and to work with the individual's family members in order to develop a plan of care.  Service coordinators may approve some services

---

[2] "ID/RD" stands for "intellectual disabilities/related disabilities."  Although the ID/RD waiver was previously known as the Mentally Retarded/Related Disabilities waiver, see Stogsdill v. South Carolina Dep't of Health and Human Servs., 763 S.E.2d 638, 639 n.1 (S.C. Ct. App. 2014), the South Carolina General Assembly amended various South Carolina code sections to replace the former terms "mental retardation" and "mentally retarded" with the terms "intellectual disability" and "person with intellectual disability."  See 2011 S.C. Act No. 47, § 13 (eff. June 7, 2011).

themselves, but as to other services, they only make a recommendation to DDSN, which decides whether to approve them. See generally 42 C.F.R. § 440.169.

Appellants contend that for many years, DDSN has failed to spend monies appropriated by the General Assembly for the services the appropriations were intended to fund. Appellants maintain that the problem has been compounded because the failure to spend the appropriated funds caused them to miss out on the federal matching funds that spending the funds would have generated.

In late 2009, several events occurred that Appellants point to as causing a reduction of services provided under the ID/RD waiver, purportedly for budgetary reasons.[3] After the General Assembly adjourned in 2009, DDSN announced that the Centers for Medicare and Medicaid Services ("CMS") had approved requested changes to the ID/RD Waiver, effective January 1, 2010. The changes included the elimination of physical therapy, occupational therapy, and speech and language services "since they [we]re covered under regular Medicaid." J.A. 2607. Also, respite hours were limited to 68 hours per month unless one of

_____

[3] Because we are reviewing orders granting motions to dismiss and motions for summary judgment, we describe the facts in the light most favorable to Appellants. For purposes of this appeal, there is no material difference in the facts we consider regarding the different motions.

7

three specific conditions were present, in which case, the client could receive up to 240 hours per month upon DDSN approval.[4]

Appellants contend that although government officials represented that the waiver changes were motivated by budget concerns, in fact the changes increased costs significantly. They further maintain that notwithstanding the claims of budgetary restraints, DHHS actually had more funding than it even needed to avoid reducing the services it had previously been providing.

---

[4] The three conditions were as follows:

1. Caregiver has been hospitalized or is receiving medical treatment causing the caregiver to be away from home for lengthy periods during the day for which respite takes the place of the caregiver to protect the health, safety, and welfare of the waiver participant.

2. The waiver participant is medically complex or severely disabled to the extent that the caregiver must provide him/her constant hands on/direct care and supervision for which the caregiver is not paid for 16 hour[s] of a 24-hour day.

. . . .

3. If support center services are unavailable to a participant age 12 to exiting high school and the primary caregiver works fulltime during the summer months of June, July, and August.

J.A. 2608.

8

The waiver amendments were not the only cause of reductions in DDSN's expenditures on ID/RD waiver services.  In December 2010, DDSN instructed the four local service coordinators in Richland and Lexington Counties to complete new assessments for ADHC service recipients in light of the requirement that ADHC services are available only if the participants either have a medically complex condition or require extensive assistance with functional activities or tasks (the "medically complex/extensive assistance requirement").[5]  Rich/Lex, in turn, informed affected consumers of the impending reassessments.[6]

Appellants allege that the effort to reduce expenditures on ID/RD waiver services was part of a plan to force them to attend Work Activity Centers ("WACs") operated by local DSN Boards.  A WAC is "[a] workshop having an identifiable program designed to provide therapeutic activities for workers with intellectual disability whose physical or mental impairment is so severe as to interfere with normal productive capacity."  S.C. Code Regs.

_____

[5] Appellees contend that this step was prompted when DDSN officials noticed in late 2010 and early 2011 that service coordinators in several counties were approving ADHC services for a greater proportion of individuals than were generally being approved in other counties.

[6] Also, in December 2010, DDSN requested reevaluation of the medical justification for provision of assistive technology and specialized medical equipment for particular consumers whose costs were particularly high.

88-405(K). Appellants contend that having more service recipients attend WACs financially benefited DDSN as well as local DSN Boards. They emphasize that the profits generated by WACs are paid to DDSN and may be spent at DDSN's discretion without oversight by its governing board or the General Assembly. Meanwhile, Appellants maintain that individuals working in WACs are paid less than minimum wage, their medical needs may not be properly attended to, and they are at risk for abuse and neglect. Appellants additionally allege that forcing ADHC recipients to attend a WAC set to open soon in Columbia, South Carolina, was the true motivation behind DDSN's attempt to terminate the ADHC services of many disabled persons in Richland and Lexington Counties.

Also at issue in this case are expenditures of DDSN funds approved by the South Carolina Budget and Control Board ("BCB"). Composed of the Governor, State Treasurer, Comptroller General, Chairman of the Senate Finance Committee, and Chairman of the House Ways and Means Committee, the BCB, at the time of the events at issue in this case, acted as "an executive body dealing primarily with the fiscal affairs of the State government." State ex rel. McLeod v. Edwards, 236 S.E.2d 406, 406-07 (S.C. 1977). However, the BCB was abolished effective July 1, 2015. See South Carolina Restructuring Act of 2014, S.C. Act No. 121 (S. 22) (2014).

10

In late 2009, DDSN requested and received BCB approval for the transfer of nearly $6 million from an excess funds account containing $7.8 million. From the requested funds, $2.6 million was to purchase buildings to be used as WACS for two DSN boards and the Babcock Center;[7] $3,244,738 was to be used for a statewide accounting system; and $100,000 was for the improvement of DDSN's Medicaid billing system. Appellants contend the transfer of these funds, which the General Assembly had intended would be spent on ID/RD waiver services, essentially gave the BCB control over the $3,244,738. Further, Appellants maintain that by not spending the funds on services, DDSN missed the opportunity to receive matching funds from the federal government.

<u>Kobe</u>

Kobe has been disabled since birth due to severe cerebral palsy. He is intelligent but cannot walk, nor can he speak in a way that others can understand him. His arms and legs are strapped to his wheelchair with Velcro to keep him from hurting himself due to his spasticity. At the time this suit was filed in 2011, he was 39 years old and he lived in a community

---

[7] The "Babcock Center is a private, non-profit corporation based in Columbia that provides housing and other services for people with autism, [intellectual disabilities], head or spinal injuries, or related disabilities." <u>Madison ex rel. Bryant v. Babcock Ctr., Inc.</u>, 638 S.E.2d 650, 654 (S.C. 2006).

training home at the Babcock Center. Kobe's physician has determined that he needs ADHC services, and Kobe has attended the Hope Bridge Adult Day Care program for many years.

In December 2010, after the aforementioned decision by DDSN to have Rich/Lex's service coordinators reassess the eligibility of persons using ADHC services, Kobe's service coordinator determined that he no longer satisfied the medically complex/extensive assistance requirement and thus was no longer eligible to continue to receive ADHC services. Kobe appealed the decision to the DDSN Director. He continued to receive ADHC during the pendency of his appeal.

Kobe also maintains that the government has not consistently provided him with a functioning wheelchair. In early 2008 his then-current wheelchair was causing him to develop painful ulcers on his buttocks. He asserts that although a wheelchair was inserted into his plan of care in January 2008, he did not actually receive the wheelchair he needed until April 2009. Then shortly thereafter, his new wheelchair was damaged and the headrest needed to be replaced. As a result, he spent weeks in bed while his wheelchair was not functional and he was unable to attend Hope Bridge.

Kobe was injured and his wheelchair further damaged on December 28, 2010, when Kobe was dropped from a van as he was being transported between Hope Bridge and the Babcock Center.

His broken wheelchair prevented him from attending Hope Bridge from December 28, 2010, until January 18, 2011. Even after his return, the wheelchair remained damaged and malfunctioned in ways that sometimes left him "in bed for days." J.A. 3656.

Kobe's efforts to obtain the equipment he needs to communicate also have often been unsuccessful. Since 2009, Kobe has been requesting help in improving his reading skills, but he has not been provided adult education classes, because he did not have a device to help him communicate. An investigation by the Lieutenant Governor's Office in the summer of 2010 into a report by Hope Bridge staff that Kobe was being neglected at the Babcock Center revealed that Kobe needed an augmentative communications device ("ACD") in order to communicate his needs to the staff. And the Lieutenant Governor's Office notified DDSN of this need in October 2010.[8] Kobe's doctors ordered speech evaluations on December 7, 2010, and on January 13, 2011, and he received an evaluation in March 2011 from the Palmetto Health Rehab Center. He tried a number of different speech devices and experienced great success with the "Tobii C12 with Eye Control," which allowed him to synthesize speech with eye

_____

[8] Kobe identified several specific health problems that he has suffered as a result of not being able to communicate properly.

movements. Such a device would enable him to communicate with staff so as to receive proper care and make his own appointments.

## Mark

Mark has Down Syndrome and, although he is an adult, he functions at the level of a two-year-old. Since his father died, he has lived with his adult sister in her home and requires constant supervision.

Like Kobe, Mark receives ADHC services and he attends Hope Bridge. Also like Kobe, Mark was notified in 2011, following Rich/Lex's reassessments, that he no longer was eligible for ADHC services, although his services continued during the pendency of the appellate process. Mark appealed the eligibility decision to the DDSN Director, but the Director upheld the decision. He therefore appealed that decision to DHHS.

Important to Mark's sister's continued ability to care for him in her home is Mark's entitlement to respite care. Mark is concerned that if his sister were to become ill and require hospitalization for several weeks, rendering her unable to care for him, the new caps would prevent him from receiving the number of respite care hours he would need and could require him to enter an institution to receive the care he would need.

## Lawsuit

14

Appellants brought this action in May 2011 in federal district court, and filed an amended complaint in October 2011.[9] Appellants' amended complaint alleges many overlapping causes of action primarily asserting, under various theories, that they were deprived of services they were entitled to receive in a timely fashion.[10] These services included ADHC for both Appellants, Kobe's wheelchair and ACD and physical, occupation, and speech and language therapy, and Mark's respite hours. Several claims challenge the BCB's alleged failure in 2009 "to insure that the funds paid to [DDSN] were spent appropriately for services Plaintiffs . . . need, despite repeated warnings from the South Carolina Legislative Audit Council, federal and state audits showing that [DDSN] was spending those funds to purchase real estate to force waiver participants into WAC's to profit the State." J.A. 220, see J.A. 225, 228, 231.

The amended complaint asserts causes of action for violation of the Americans with Disabilities Act of 1990 ("ADA"), see 42 U.S.C. §§ 12101 et seq. (Count One); violation

---

[9] Originally there was a third plaintiff, who was eventually voluntarily dismissed from the suit.

[10] Among other theories, Appellants alleged that Appellees have failed to give deference to the treating orders of their physicians; endangered their right to receive services in the most integrated setting appropriate, and failed to establish reasonable standards and promulgate regulations for operating the waiver program.

15

of Section 504 of the Rehabilitation Act of 1973, see 29 U.S.C. § 794 (Count Two); violation of 42 U.S.C. § 1983 (Count Three); violation of 42 U.S.C. § 1983 and 1988 (Count Four);[11] commission of a conspiracy in violation of 42 U.S.C. 1985(3) (Count Five); violation of the Supremacy Clause (Count Six); and violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), see 18 U.S.C. §§ 1503, 1512, 1513 (Count Seven). Kobe also asserted state law claims for negligence, intentional infliction of emotional distress, and assault and battery against the Babcock Center and other Appellees in regard to his care during the time he lived there (Count Eight).[12]

---

[11] Counts Three and Four included allegations of violations of Appellants' rights under the Fourth, Fifth, and Fourteenth Amendments to the United States Constitution, as well as the Medicaid Act, see 42 U.S.C. § 1396 et seq.

[12] The amended complaint named numerous state officials and others as defendants (collectively, "Appellees"). The defendants can be divided into several categories. There are DHHS Directors – Emma Forkner and Anthony Keck ("the DHHS Appellees"); DDSN Directors and other DDSN officials – Beverly Buscemi, Eugene Laurent, Stanley Butkus, Kathi Lacy, Richard Huntress, Thomas Waring and Jacob Chorey ("the DDSN Appellees"); the Director of Rich/Lex – Mary Leitner; the Director of the Babcock Center, Judy Johnson, as well as other unnamed actors associated with the Babcock Center (collectively, "the Babcock Center Appellees"); and the Governor and other members of the BCB (the "BCB Members").

The BCB Members included Governor Haley, who assumed office in January 2011 as Governor of South Carolina and Chairman of the BCB; former Governor Mark Sanford, who preceded Governor Haley as Governor and BCB Chairman; former State Representative Daniel Cooper, who served as a BCB member by virtue of his
(Continued)

As is relevant here, the amended complaint requests that the district court:

- "Issue an order of protection prohibiting [DDSN] and its agents and employees from retaliating against the Plaintiffs or their families."

- "Assume jurisdiction over this action and maintain continuing jurisdiction until the Defendants are in full compliance with every order of [the district court.]"

- "Issue an injunctive order declaring that Defendants' policies, practices, acts and omissions, as set forth above, violate Plaintiff[s'] rights under the ADA and Section 504 of the Rehabilitation Act and the Medicaid Act."

- "[Issue] an order prohibiting the Defendants from reducing ADHC services and requiring Defendants to provide such additional services as shall be medically necessary, as shall be determined by [Plaintiffs'] treating physicians, so as to allow Plaintiffs . . . to live in the most integrated settings possible . . . ."

- "So long as the cost of these services is less than the cost of ICF/MR services, [issue] . . . an

---

service as Chairman of the Ways and Means Committee of the South Carolina House of Representatives until January 2011; former State Treasurer Converse Chellis, who served as a BCB member by virtue of his position as State Treasurer until January 2011; State Senator Hugh Leatherman, who served as a BCB member by virtue of his position as Chairman of the Finance Committee of the South Carolina Senate until the BCB was abolished in 2014; and State Treasurer Curtis Loftis and Representative Brian White, who succeeded Chellis and Cooper, respectively, and both of whom served as BCB Members until the BCB was abolished in 2014.

Governor Haley, Loftis, and White were sued solely in their official capacities, while the other Appellees were sued in both their individual and official capacities.

17

order requiring Defendants to provide Medicaid waiver services as shall be determined by the treating physicians to be necessary absent review and an order from the [district court] during this litigation."

- "[Disgorge from] Defendants and their associated enterprises or organizations . . . ill gotten gains."

J.A. 244-45. The amended complaint also requests actual and punitive damages and attorneys' fees and costs.[13]

<u>Events Subsequent to the Filing of this Lawsuit</u>

In May 2011, Kobe moved out of the Babcock Center to a congregate group home operated by United Cerebral Palsy, a private provider. However, Kobe has stated that he "want[s] to live in [his] own apartment in the community instead of living in a home with three other people who have disabilities." J.A. 3655.

Kobe's troubles obtaining and maintaining a working wheelchair continued after filing this suit. Kobe's plan of care as of May 12, 2011, included the need for a new wheelchair or a repair of the one he had been using. Weeks passed, however, and he did not receive a new one.

Kobe's struggles to obtain the Tobii ACD continued as well. As of June 7, 2011, his plan of care included the Tobii C12 ACD. Nevertheless, once more than a year had passed after Kobe's

---

[13] The amended complaint contains class action allegations in the body of the complaint. However, Appellants sought no class certification and have conceded that this action is not being brought on behalf of others.

18

speech evaluation, Kobe was told that he would need a new evaluation because the first one was not sufficiently recent.

Kobe received another evaluation, during which he tried several ACDs that did not work for him due to his spasticity. The evaluator again determined that he needed the Tobii device. Kobe's treating physician signed an order requesting the device, certifying it as medically necessary, and Kobe requested it from DHHS. DHHS initially denied his request on August 23, 2011, on the basis that Kobe had not provided adequate documentation of medical need. As of the filing of the amended complaint in October 2011, Kobe still had not received the device he had requested.

As for Kobe's pending appeal of his service coordinator's decision that he no longer qualified for ADHC services, on May 11, 2011 – the same day Appellants filed their original complaint – DDSN's Director reversed the service coordinator's decision, determining that Kobe indeed <u>did</u> satisfy the then-existing requirements. As the result of this reversal, Kobe's ADHC services never lapsed.

Despite obtaining a reversal of the decision that he was no longer eligible for ADHC, Kobe appealed to DHHS. In his appeal, Kobe complained that he had not received written notice of the intent to reduce or eliminate his services. He also complained that DHHS had failed to provide him "with speech and language

19

services, physical therapy, occupational therapy, adult companion services and with an appropriate communications device or to notify him of all feasible alternatives under the [ID/RD] Medicaid waiver." J.A. 2533. The appeal was resolved in mid-October 2011 according to the following terms provided in an August 9, 2012, consent order:

> 1. The Parties agree that [Kobe] meets criteria for and is appropriate for [ADHC]. Waiver participants are evaluated yearly under 42 CFR §441.302(c)(2).
>
> 2. As an [ID/RD] Waiver Participant, [Kobe] will be allowed to continue to receive ADHC offered by the [ID/RD] Waiver, provided by the qualified provider of his choice.

J.A. 2458.

Mark's appeal to DHHS regarding his ADHC eligibility was also resolved in mid-October 2011 by agreement. An August 2012 consent order memorializing the agreement contained language identical to that of Kobe's and thus established that Mark satisfied the medically complex/extensive assistance requirement. Like Kobe's ADHC services, Mark's never lapsed.

Shortly after resolving Appellants' administrative appeals, DHHS eliminated the medically complex/extensive assistance requirement that had been the basis for Appellants' service coordinators' initial decisions ("the 2011 Policy Change").

<u>Motions to Dismiss and for Summary Judgment</u>

20

As the present lawsuit continued, Governor Haley, Loftis, White, Cooper, and Chellis filed motions to dismiss the claims against them, arguing they were entitled to dismissal for a variety of reasons. See Fed. R. Civ. P. 12(b)(1), (6). They all maintained they were entitled to dismissal on the basis of Eleventh Amendment immunity of all claims asserted against them in their official capacities.

In their memoranda opposing dismissal of these defendants on the basis of Eleventh Amendment immunity, Appellants relied primarily on the Ex Parte Young exception to Eleventh Amendment immunity. See Ex parte Young, 209 U.S. 123 (1908). They asserted that as to Loftis, White, Cooper, and Chellis, Appellants were seeking prospective relief only. See J.A. 781 ("Plaintiffs . . . seek only prospective relief against Defendants Loftis and White."); J.A. 1086 ("All of the relief requested by the Plaintiffs as to Defendant Cooper is prospective."); J.A. 1115 ("Only prospective relief, and attorneys fees, are requested from [Chellis].").

Considering the various motions, the district court dismissed all claims against Haley, Cooper, Loftis, Chellis, and White. Regarding the claims asserted against them in their official capacities, the district court concluded that these defendants were entitled to Eleventh Amendment immunity as a matter of law. The court ruled that the Ex Parte Young

21

exception did not apply to requests for redress for violations that occurred wholly in the past, including those relating to the BCB's involvement in the use of funds from the excess fund to purchase real estate. Regarding prospective relief for ongoing violations, the court concluded that none of these defendants had the requisite special connection to the administration of the state's Medicaid program such that an injunction against them would provide Appellants any effective redress. And to the extent the defendants were sued in their individual capacities, the court ruled that there could be no prospective relief; the court reasoned that even should an injunction be entered against them, they did not occupy any positions through which they could remedy Appellants' claimed injuries. The court also ruled that they were entitled to legislative immunity.

Leatherman and Eckstrom subsequently filed a motion to dismiss or for summary judgment, advancing arguments similar to those of the other BCB Members. Appellants opposed the motion, but, as they had regarding Loftis, White, Cooper, and Chellis, they abandoned any claims for retrospective relief against these defendants. See J.A. 2240 ("[T]he only relief [Appellants] request from [Leatherman and Eckstrom] is injunctive relief."). The district court granted the motion, ruling that Leatherman and Eckstrom were entitled to Eleventh Amendment immunity

22

because the Ex Parte Young exception did not apply since Appellants could not obtain any prospective injunctive relief against Leatherman and Eckstrom and because Appellants alleged no ongoing violation of the law. The court also ruled Leatherman and Eckstrom were entitled to legislative immunity to the extent they were sued in their individual capacities.

The case then proceeded against the remaining defendants. After discovery had been completed, Appellants and the remaining defendants filed cross-motions for summary judgment.[14] As is relevant to this appeal, several of the defendants maintained that the claims in this suit were no longer justiciable. The DDSN Appellees, in particular, contended that several events mooted Appellants' claims. They argued that the 2011 Policy Change mooted any issue about Appellants' entitlement to prospective relief protecting their right to receive ADHC. The DDSN Appellees also argued that the reversal by their Director of the determination that Kobe was not eligible for ADHC, at a time when the Director was not even aware of the existence of the lawsuit, mooted any claim regarding the service

---

[14] The parties had once previously filed cross-motions for summary judgment. The district court denied those motions without prejudice so as to allow Defendants to engage in discovery regarding certain witnesses that Plaintiffs had only recently identified.

23

coordinator's original decision. The Babcock Center Appellees also argued that Appellants failed to forecast evidence of proper damages to meet RICO's standing requirements.

In support of their motion for partial summary judgment, Appellants contended they were entitled to summary judgment on several individual issues relating to the merits of their claims. And, in opposition to the remaining Appellees' summary judgment motions, Appellants maintained, as is pertinent here, that the "voluntary cessation" exception to the mootness doctrine prevented the 2011 Policy Change from mooting the claims concerning their ADHC eligibility, Kobe's equipment needs, and the provision of in-home services to Mark.

### Additional Developments Regarding Kobe's Attempts to Obtain an ACD

DHHS formally denied Kobe's request for the Tobii device on November 14, 2011. DHHS's response stated that the reason for the denial was that Kobe was not involved in educational endeavors but instead needed to communicate only in order to express health and well-being needs, comfort and discomfort, and to conduct normal speech.[15] On that basis, DHHS decided that an

---

[15] Appellants express frustration with DHHS's position in light of their allegation that Kobe had been denied educational opportunities because he did not have a speech device.

ACD with pre-recorded messages, as opposed to an ACD that synthesized speech, would be adequate for him. Rather than engage in what they expected would be a lengthy administrative appeal process, Appellants decided to litigate Kobe's claims regarding his entitlement to the ACD in the current lawsuit.

Nearly two years after DHHS had denied his request, in the summer of 2013, Rich/Lex was "able to secure a Tobii unit for 'Kobe' through the University of South Carolina Assistive Technology Exchange Program" (the "USC Program"). J.A. 2558. There is no dispute that the "Tobii C-15 Eye Gaze unit" the USC Program provided "allows [Kobe] to communicate by shifting his eye gaze to letters on a board" and thus is sufficient to meet Kobe's needs. J.A. 2558. However, as of January 2, 2014, the unit was not attached to Kobe's damaged wheelchair. Kobe therefore could not effectively use the device when he left his home. By the time of the September 23, 2014, summary judgment hearing, Kobe had finally received a new wheelchair, but the ACD had not yet been attached.

Kobe describes the ACD that the USC Program has allowed him to use as a "loaner," and he states that "it does not belong to [him] and [he is] afraid that they will take it back once this lawsuit is over." Appellants' brief at 25 (internal quotation marks omitted); J.A. 3654. However, Rich/Lex's representative stated in a January 2014 affidavit that "[t]he arrangement with

25

the USC Program is that 'Kobe' can keep the . . . device so long as he continues to use it." J.A. 2558. The representative added in a later affidavit that the USC Program director had stated that "the device was Kobe's as long as he uses it" and if Kobe "ever stops using it – which is unlikely – [the USC Program] would probably like it back so someone else would be able to benefit from it; but there is no express agreement or contract to that effect, and the device is not 'on loan' to Kobe." J.A. 4440.

Considering the cross-motions for summary judgment from the remaining parties, the district court[16] granted summary judgment against Appellants on all claims (except for Count Eight, asserting state law claims against the Babcock Center Appellees), and denied Appellants' motion.[17] The district court's decision was based on a combination of three grounds relating to justiciability: (1) that Kobe's entitlement to a wheelchair was mooted when he received a functioning chair during this case, (2) that Mark's claim to additional respite care hours was not ripe because the possibility that the new

---

[16] The case had been reassigned to a different district judge in July 2014.

[17] The district court also dismissed former Governor Sanford since there was no evidence that he was ever served with copies of the summons and complaint. See Fed. R. Civ. P. 4(m).

26

caps would cause him to be institutionalized was only speculative, and (3) that Appellants lacked standing to seek injunctive relief from the "allege[d] systemic failures within the DHHS and DDSN systems" and the alleged "mishandling of funds and exploitation" because they did not show a particular cognizable injury or an immediate threat of injury from that alleged conduct, J.A. 4432. The district court, noting that "Kobe's ACD device was not installed on his wheelchair at the time of the hearing and thus [was] not accessible to him[,] . . . order[ed] that the ACD device be properly affixed to Kobe's wheelchair no later than ten (10) days from the date of entry of th[e] order." J.A. 4433 (emphasis omitted). The device has since been installed.

Appellants subsequently filed a motion to alter or amend, challenging the grant of summary judgment on a variety of grounds. See Fed. R. Civ. P. 59(e). As is relevant here, they contended that the district court ignored much of the factual predicate supporting several of their claims and failed to explain its decision to dismiss several other claims. They specifically emphasized the court's failure to address their claims that Appellees failed to provide Kobe a wheelchair and ACD with reasonable promptness. Regarding justiciability, Appellants argued that the district court failed to recognize that they were among the intended beneficiaries of the DHHS

27

funds used to purchase real estate. They contended that their challenges to illegal policies were ripe because the administrative decisions at issue had already been finalized.

Before the court ruled on that motion, the parties settled Count 8, regarding injuries Kobe allegedly suffered while living at the Babcock Center, and the claim was dismissed by a consent order.

The court later denied Appellants' Rule 59(e) motion. Regarding a contention by Appellants that the court had not addressed Kobe's claim that he was entitled to be placed in a Supervised Living Program ("SLP") apartment,[18] the district court concluded that such a claim was not ripe because "[t]here is no evidence regarding if or when [any request made by Kobe to Rich/Lex] was forwarded to [DDSN], or whether DDSN has rendered an unfavorable administrative decision or failed to respond to Kobe's request." J.A. 4495.

II.

Appellants first argue that the district court erred in granting summary judgment against the then-remaining defendants

---

[18] An SLP would be a less-restrictive setting than the one Kobe currently lives in.

28

on justiciability grounds on Counts One through Seven.[19] Appellees, on the other hand, maintain that the district court properly ruled that no live controversy remains in this case. Appellees argue that because no justiciable issues remain, we need not even address the Appellants' arguments regarding the dismissal of the BCB Members from the case. We therefore begin our analysis with these justiciability questions. See Bender v. Williamsport Area Sch. Dist., 475 U.S. 534, 541 (1986) ("[E]very federal appellate court has a special obligation to satisfy itself not only of its own jurisdiction, but also that of the lower courts in a cause under review." (internal quotation marks omitted)).

We review de novo a district court's ruling concerning subject-matter jurisdiction. See Simmons v. United Mortg. & Loan Inv., LLC, 634 F.3d 754, 762 (4th Cir. 2011). "We review a district court's decision to grant summary judgment de novo, applying the same legal standards as the district court, and viewing all facts and reasonable inferences therefrom in the light most favorable to the nonmoving party." T-Mobile Ne., LLC v. City Council of Newport News, 674 F.3d 380, 384–85 (4th Cir. 2012) (internal quotation marks omitted). Summary judgment is

---

[19] At the summary judgment hearing, Appellants abandoned any damages claims against the remaining defendants.

appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

In order for the federal courts to have jurisdiction, plaintiffs must possess standing under Article III, § 2 of the Constitution. See David v. Alphin, 704 F.3d 327, 333 (4th Cir. 2013). Article III standing, in turn, has three "irreducible minimum requirements":

> (1) an injury in fact (i.e., a 'concrete and particularized' invasion of a 'legally protected interest');
>
> (2) causation (i.e., a 'fairly ... trace[able]' connection between the alleged injury in fact and the alleged conduct of the defendant); and
>
> (3) redressability (i.e., it is 'likely' and not merely 'speculative' that the plaintiff's injury will be remedied by the relief plaintiff seeks in bringing suit).

Pender v. Bank of Am. Corp., 788 F.3d 354, 365 (4th Cir. 2015) (quoting Sprint Commc'ns Co., L.P. v. APCC Serv., Inc., 554 U.S. 269, 273-74 (2008)). Regarding the injury-in-fact prong, "[a]n allegation of future injury may suffice if the threatened injury is certainly impending, or there is a substantial risk that the harm will occur." Susan B. Anthony List v. Driehaus, 134 S. Ct. 2334, 2341 (2014) (internal quotation marks omitted).

"To qualify as a case fit for federal-court adjudication, an actual controversy must be extant at all stages of review, not merely at the time the complaint is filed." Arizonans for

30

*Official English v. Arizona*, 520 U.S. 43, 67 (1997) (internal quotation marks omitted). Accordingly, a case is moot "when the issues presented are no longer 'live' or the parties lack a legally cognizable interest in the outcome." *Chafin v. Chafin*, 133 S. Ct. 1017, 1023 (2013) (some internal quotation marks omitted).

Another "Article III threshold question" is whether a "dispute is ripe for adjudication." *Lansdowne on the Potomac Homeowners Ass'n, Inc. v. OpenBand at Lansdowne, LLC*, 713 F.3d 187, 198 (4th Cir. 2013). "A claim should be dismissed as unripe if the plaintiff has not yet suffered injury and any future impact remains wholly speculative." *Doe v. Virginia Dep't of State Police*, 713 F.3d 745, 758 (4th Cir. 2013) (internal quotation marks omitted). "The basic rationale of the ripeness doctrine is to prevent the courts, through avoidance of premature adjudication, from entangling themselves in abstract disagreements over administrative policies, and also to protect the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties." *Pacific Gas & Elec. Co. v. State Energy Res. Conserv. & Dev. Comm'n*, 461 U.S. 190, 200 (1983) (internal quotation marks omitted). When determining ripeness, we traditionally consider "(1) the fitness of the issues for judicial decision and (2) the hardship to the parties

of withholding court consideration." Cooksey v. Futrell, 721 F.3d 226, 240 (4th Cir. 2013) (internal quotation marks omitted). "A case is fit for adjudication when the action in controversy is final and not dependent on future uncertainties"; conversely, a claim is not ripe when "it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all."[20] Scoggins v. Lee's Crossing Homeowners Ass'n, 718 F.3d 262, 270 (4th Cir. 2013) (internal quotation marks omitted). The hardship prong, on the other hand, "is measured by the immediacy of the threat and the burden imposed on the plaintiffs." Miller v. Brown, 462 F.3d 312, 319 (4th Cir. 2006) (alterations and internal quotation marks omitted).

Regarding the district court's conclusion that events during the pendency of this case have put an end to any live controversy, Appellants contend that the record, viewed in the light most favorable to them, demonstrates that:

> Appellees have not yet voluntarily ceased the conduct of failing to provide services with reasonable promptness, failing to establish reasonable standards, failing to provide services in the amount, duration and scope necessary to meet Plaintiffs['] needs in order [for them to be able] to remain in the least restrictive setting.

---

[20] A fit case would ideally present "purely legal" issues. See Miller v. Brown, 462 F.3d 312, 319 (4th Cir. 2006).

32

Appellants' brief at 44. They also contend that the caps affecting the amount of respite care Mark can receive have not been eliminated. They argue that even to the extent that Appellees have voluntarily ceased some of the complained-of conduct by confirming their eligibility for ADHC or providing them with requested services and equipment, exceptions to the mootness doctrine apply. And they maintain that the district court failed to explain how its conclusions regarding justiciability justified granting summary judgment on their various claims.

We will address these seriatim, beginning with the issues relating to Appellants' eligibility to receive ADHC, and then moving to those pertaining to Kobe's requests for particular equipment and services. Then, finally, we will address the district court's implicit conclusion that the justiciability issues warranted granting summary judgment against Appellants on each of the first seven counts.[21]

_____

[21] In their initial brief, Appellants do not challenge the district court's ruling that their challenge to the respite-hours caps was not ripe because they had not shown that Mark had in fact been affected by the caps or that there was any nonspeculative possibility that he would be affected in the future. For the first time, in their reply brief, Appellants offer a cursory challenge to that conclusion, suggesting that if his circumstances were to change such that his sister became physically incapacitated or otherwise unable to care for him for an extended period, then the caps could prevent him from receiving the respite care he would need and could even result
(Continued)

33

We start with Appellants' argument that their claims remain justiciable to the extent they concern the termination of their eligibility to receive ADHC services.  Appellants contend that despite the fact that they prevailed during the administrative appeal process regarding termination of their ADHC services, the claims relating to those services continue to present a live controversy and should not be dismissed as moot.[22]

"It is well settled that [the] defendant's voluntary cessation of a challenged practice does not deprive a federal

_____

in his institutionalization.  Even if the issue were properly before us, Appellants have done nothing to demonstrate that the prospect of such a change in circumstances was anything more than speculative.  Nor have they identified any immediate hardship Mark would suffer from being unable to resolve the legality of the new limits in this suit.  We conclude therefore that they have failed to satisfy their burden of showing that their challenges to the new respite-hour limitations are ripe.  See Miller, 462 F.3d at 319 ("The burden of proving ripeness falls on the party bringing suit.").

Appellants offer no challenge to the district court's ruling that their claim that Kobe is entitled to be provided with an SLP is unripe.  Nor do they challenge the ruling that Appellants' claim demanding payment for the speech pathologist who evaluated Kobe and provided him with speech services fell outside the scope of their complaint.  We therefore do not address those issues.

[22] Appellants argue that at this stage they are entitled to an award of attorneys' fees regarding claims in which Appellees have voluntarily ceased their allegedly wrongful conduct. However, Appellants do not identify any ruling by the district court addressing the fee issue, and we decline to address the attorneys'-fee issue in the first instance.

34

court of its power to determine the legality of the practice" unless it is "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., Inc., 528 U.S. 167, 189 (2000) (internal quotation marks omitted); see Knox v. Service Emps. Int'l Union, Local 1000, 132 S. Ct. 2277, 2287 (2012) ("The voluntary cessation of challenged conduct does not ordinarily render a case moot because a dismissal for mootness would permit a resumption of the challenged conduct as soon as the case is dismissed."). Without that rule, "courts would be compelled to leave the defendant free to return to his old ways." City of Mesquite v. Aladdin's Castle, Inc., 455 U.S. 283, 289 n.10 (1982) (alterations and internal quotation marks omitted). The party asserting mootness bears "[t]he 'heavy burden of persua[ding]' the court that the challenged conduct cannot reasonably be expected to start up again." Wall v. Wade, 741 F.3d 492, 497 (4th Cir. 2014) (quoting Laidlaw, 528 U.S. at 189).

Additionally, "[a] case that would otherwise be moot is not so if the underlying dispute is 'capable of repetition, yet evading review.'" Stop Reckless Economic Instability Caused by Democrats v. FEC, 814 F.3d 221, 229 (4th Cir. 2016) (quoting Southern Pac. Term. Co. v. ICC, 219 U.S. 498, 515 (1911)). The Supreme Court has explained

35

that in the absence of a class action, the "capable of repetition, yet evading review" doctrine [is] limited to the situation where two elements combined: (1) the challenged action was in its duration too short to be fully litigated prior to its cessation or expiration, and (2) there was a reasonable expectation that the same complaining party would be subjected to the same action again.

Weinstein v. Bradford, 423 U.S. 147, 149 (1975) (per curiam).

Appellants argue, essentially, that Appellees' reversal of their service coordinators' decisions that they were no longer eligible for ADHC services was a voluntary cessation of Appellees' challenged conduct. Appellants maintain that Appellees have not met their "heavy burden" of showing that, if Appellants' claims are dismissed, Appellees would not simply reverse course again after this litigation regarding Appellants' eligibility for ADHC. See Pashby v. Delia, 709 F.3d 307, 316 (4th Cir. 2013). We disagree.

Assuming that when this suit was initiated Appellants had standing to challenge their service coordinator's initial decision that they were no longer eligible to receive ADHC, the claims regarding their eligibility became moot once Appellants obtained a reversal of the decision through the administrative appeal process without ever having their ADHC discontinued. The reversals were "not . . . voluntary cessation[s] within the meaning of that doctrine, but w[ere] instead the result of [Appellants'] successful administrative appeal[s]." Oregon Nat.

36

Res. Council, Inc. v. Grossarth, 979 F.2d 1377, 1379 (9th Cir. 1992) (holding that action challenging United States Forest Service's approval of a timber sale became moot when challenged sale was halted as a result of an administrative appeal). Cf. ACLU of Mass. v. U.S. Conference of Catholic Bishops, 705 F.3d 44, 55 (1st Cir. 2013) ("The voluntary cessation doctrine does not apply when the voluntary cessation of the challenged activity occurs because of reasons unrelated to the litigation." (internal quotation marks omitted)); Sze v. INS, 153 F.3d 1005, 1008 (9th Cir. 1998) (similar).

Appellants' argument that their challenges regarding their ADHC eligibility fit within the capable-of-repetition exception fail as well. Appellants offer no argument as to why such claims would inherently be too short in duration to be able to be fully litigated, and we know of no reason that they would be. See Weinstein, 423 U.S. at 149. We therefore conclude that the district court correctly determined that Appellants' challenges regarding their eligibility for ADHC services are moot.

We reach the opposite conclusion, however, concerning Appellants' claims regarding Appellees' responses to Kobe's needs for particular equipment and technology. Appellants allege, under various legal theories, that Appellees wrongfully failed to promptly provide Kobe with the equipment he needed, particularly a functioning wheelchair and the ACD he requested.

37

Appellants argue that even if Appellees' conduct during this case has satisfied Kobe's needs for the time being, neither Appellees nor the district court offer any suggestion as to how Appellees have carried the heavy burden of showing that the complained-of pattern of allegedly unreasonable delays and improper denials will not resume after this case is completed. In fact, Appellees have not even made that showing with regard to the specific items that are the subject of Kobe's claims.

Kobe's future prospects with regard to the ACD seem especially uncertain. DHHS denied his request for the ACD his doctor ordered, and while the USC Program, apparently at Rich/Lex's request, has now voluntarily allowed Kobe to use a satisfactory ACD, there is no indication that DHHS has ever altered its decision that Kobe is not legally entitled to such a device. If, after this case is completed, the USC Program requests return of the ACD or if Kobe needs it adjusted, repaired, or replaced, he could well be met with the same sort of allegedly improper delays and denials that he claims repeatedly occurred before he decided to press his claims in court.[23]    Cf. Pashby, 709 F.3d at 316 (holding that state

---

[23] In fact, it was only by virtue of an order of the district court in this case that Appellees even attached the device to Kobe's wheelchair so that it would be accessible to him outside of his house.

38

agency's "voluntar[y] reinstate[ment]" of benefits after agency had previously announced that recipients no longer met the eligibility requirements for those benefits did not moot suit challenging the termination of the benefits when agency "remain[ed] free to reassess the [recipients'] needs and cancel their [benefits] at any time"). And Kobe certainly has reason to be concerned in light of the many problems he has had obtaining reasonably prompt responses from Appellees regarding his allegedly often-nonfunctional wheelchair, the condition of which is also critical to his quality of life. In sum, Appellees have not met their "heavy burden" of showing that after this litigation has concluded, Kobe will not once again find himself without the equipment he needs and without any ability to obtain it without significant delay. We therefore conclude that to the extent Appellants challenge Appellees' response to Kobe's need for equipment, his challenges are not mooted by Appellees' temporary satisfaction of his needs during the pendency of this lawsuit. Accordingly, we vacate the district court's order granting summary judgment against Appellants on justiciability grounds, and remand for further proceedings consistent with this opinion.

In addition to arguing that this case presented a live controversy, Appellants contend that the district court erred in failing to explain its decision not to address the merits of

several of their claims.  Indeed, the district court did not explain in any detail how its conclusions regarding justiciability justified granting summary judgment on each of Appellants' first seven claims.  Because we hold that this case in fact continues to present justiciable issues, we vacate the grant of summary judgment against Appellants on Counts One through Seven and remand to the district court for further consideration of the viability of each of Appellants' claims against each of the Appellees.  To the extent that the district court concludes on remand that any particular Appellees are entitled to prevail as a matter of law on any particular claims, the court should fully explain its analysis.[24]

### III.

We now turn to Appellants' argument that the district court erred in dismissing the official-capacity claims against several of the BCB Members – Governor Haley, Leatherman, Eckstrom, Chellis, and Cooper – on the basis of Eleventh Amendment immunity.[25]

---

[24] We express no view on any issue not addressed in this opinion, whether related to justiciability or otherwise.

[25] Appellants do not appeal the dismissal of Loftis, White, or Sanford.

The Eleventh Amendment to the United States Constitution provides: "The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." Eleventh Amendment immunity protects unwilling states from suit in federal court. See Will v. Michigan Dep't of State Police, 491 U.S. 58, 70 (1989); Edelman v. Jordan, 415 U.S. 651, 662–63 (1974).[26] "State officers acting in their official capacity are also entitled to Eleventh Amendment protection, because 'a suit against a state official in his or her official capacity is not a suit against the official but rather is a suit against the official's office.'" Lytle v. Griffith, 240 F.3d 404, 408 (4th Cir. 2001) (quoting Will, 491 U.S. at 71).

The Supreme Court, however, delineated an exception to the application of the Eleventh Amendment in Ex parte Young. That exception "permits a federal court to issue prospective, injunctive relief against a state officer to prevent ongoing violations of federal law, on the rationale that such a suit is not a suit against the state for purposes of the Eleventh

---

[26] Although the language of the Eleventh Amendment does not explicitly apply to suits brought against a state by one of its own citizens, the Amendment has been construed to bar such suits. See Equity in Athletics, Inc. v. Department of Educ., 639 F.3d 91, 107 n.12 (4th Cir. 2011).

Amendment." McBurney v. Cuccinelli, 616 F.3d 393, 399 (4th Cir. 2010). "Ex parte Young requires a 'special relation' between the state officer sued and the challenged [provision] to avoid the Eleventh Amendment's bar." Waste Mgmt. Holdings, Inc. v. Gilmore, 252 F.3d 316, 331 (4th Cir. 2001) (quoting Ex Parte Young, 209 U.S. at 157); see also DeBauche v. Trani, 191 F.3d 499, 505 (4th Cir. 1999) (explaining that the Ex Parte Young exception "applies only when there is an ongoing violation of federal law that can be cured by prospective relief"). This requirement "protects a state's Eleventh Amendment immunity while, at the same time, ensuring that, in the event a plaintiff sues a state official in his individual capacity to enjoin unconstitutional action, any federal injunction will be effective with respect to the underlying claim." McBurney, 616 F.3d at 399 (alteration and internal quotation marks omitted).

Here, the district court concluded that none of the prospective relief Appellants sought from the BCB Members fit within the Ex Parte Young exception because these defendants had no "control or enforcement rights over any agency regarding the Plaintiffs' ADHC or other Medicaid services" and thus that "impos[ing] a prospective injunction on [Loftis and White] would have no effect whatsoever." J.A. 1136; see J.A. 1134 ("[T]o impose a prospective injunction on Governor Haley to cure any alleged Medicaid violations would have no effect."); J.A. 1136

42

("Plaintiffs would not be able to obtain any prospective injunctive relief from Defendant Cooper in his official capacity as he is no longer a member of the [BCB] and would have no authority to provide such relief."); J.A. 1140 ("Defendant Chellis is not involved in any ongoing constitutional deprivations and could not provide Plaintiffs, should they prevail, with the prospective injunctive relief they seek."); J.A. 2372 ("Plaintiffs would not be able to obtain any prospective injunctive relief from [Leatherman and Eckstrom] in their official capacities as they would not have any control or enforcement rights over any agency regarding the Plaintiffs' ADHC or other Medicaid services."). Appellants offer no specific challenge to the district court's conclusions regarding Leatherman, Eckstrom, Chellis, and Cooper. And, especially in light of the fact that the BCB is now abolished, with its responsibilities having been transferred to the Governor, there would be no basis to challenge the court's conclusion regarding these Appellees.

However, Appellants do challenge the district court's analysis concerning Governor Haley. In arguing that Governor Haley bears the necessary relationship to the ongoing violations they allege, they note that Appellees "have refused to restore service levels of waiver participants to the pre-2010 level, . . . refused to pay for Kobe's speech services, refused to

43

acknowledge Kobe's right under the Medicaid Act and ADA to a speech device and have refused to provide funding for Kobe to live outside of a congregate setting." Appellants' brief at 35. What Appellants fail to appreciate, however, is that Governor Haley is not an official with responsibility for these decisions, nor does she have the authority to change them. South Carolina has designated DHHS to administer and supervise Medicaid. See S.C. Code § 44-6-30; see also 42 C.F.R. § 431.10 (providing that each state's Medicaid plan must designate a single state agency to administer the Medicaid plan). And DHHS "may not delegate, to other than its own officials, the authority to supervise the plan or to develop or issue policies, rules, and regulations on program matters." 42 C.F.R. § 431.10(e). Although Governor Haley appoints DHHS's Director, see S.C. Code § 44-6-10, she has no direct authority to administer South Carolina's Medicaid plans; rather, she is limited to reviewing and commenting on proposed plans, see 42 C.F.R. § 430.12(b).

In arguing that injunctive relief against Governor Haley could nevertheless remedy the ongoing violations that they allege, Appellants argue that Governor Haley "is the single most influential individual in the State with the power to influence the General Assembly to establish a budget and to promulgate regulations to bring DDSN and DHHS into compliance."

44

Appellants' brief at 36. But the fact that a governor, by virtue of her office, may have political influence over those who are responsible for ongoing violations and have the authority to end them does not give the governor the "special relation" needed to make her a proper defendant under Ex Parte Young. Cf. Waste Mgmt. Holdings, 252 F.3d at 331 ("The fact that [a governor] has publicly endorsed and defended the challenged statutes does not alter our analysis [holding that the governor lacks the special relation required under Ex Parte Young to be sued regarding the statutes].). Rather, a more direct connection is required. The district court therefore properly ruled that Appellants' claims against Governor Haley did not fit within the Ex Parte Young exception.

Appellants next assert that regardless of whether their claims fit within Ex Parte Young, Governor Haley, Leatherman, Eckstrom, Chellis, and Cooper were not entitled to be dismissed regarding Counts One and Two on Eleventh Amendment grounds. Concerning Count One, Appellants contend that Congress validly abrogated South Carolina's Eleventh Amendment immunity as to claims alleging violations of Title II of the ADA. As for Count Two, Appellants argue that South Carolina waived its Eleventh

45

Amendment immunity by accepting federal financial assistance for its Medicaid program. We address these arguments in turn.[27]

In their initial brief to us, Appellants argued that the district court erred in dismissing Count One as against these Appellees on Eleventh Amendment immunity grounds, maintaining that Congress validly abrogated the States' Eleventh Amendment immunity for claims alleging a violation of Title II of the ADA. Appellants relied on our decision in Constantine v. Rectors, George Mason Univ., 411 F.3d 474, 486 (4th Cir. 2005), holding that "the accommodation requirement of Title II, as it applies to cases involving the administration of higher education programs, represents a congruent and proportional response to a

---

[27] Although Appellants opposed dismissal of these Appellees Eleventh Amendment immunity grounds, it does not appear that they specifically argued that Congress validly abrogated the States' immunity with regard to the ADA claim or that South Carolina waived immunity to Rehabilitation Act claims by virtue of accepting Medicaid funds. Rather, Appellants focused their Eleventh-Amendment arguments on the application of the Ex Parte Young exception. Nevertheless, Appellees do not assert that Plaintiffs have waived these arguments by failing to raise them earlier. See Kamen v. Kemper Fin. Servs., Inc., 500 U.S. 90, 99 (1991) ("When an issue or claim is properly before the court, the court is not limited to the particular legal theories advanced by the parties, but rather retains the independent power to identify and apply the proper construction of governing law."); Dan Ryan Bldrs., Inc. v. Crystal Ridge Dev., Inc., 783 F.3d 976, 980 (4th Cir. 2015) ("[T]he Supreme Court has long recognized that a court may consider an issue antecedent to and ultimately dispositive of the dispute before it, even an issue the parties fail to identify and brief." (alteration and internal quotation marks omitted)).

history and pattern of unconstitutional disability discrimination by States and nonstate government entities." See also id. at 484-90. They also drew support from the Supreme Court's decision in Tennessee v. Lane, 541 U.S. 509, 533-34 (2004), which held that "Title II, as it applies to the class of cases implicating the fundamental right of access to the courts, constitutes a valid exercise of Congress' § 5 authority to enforce the guarantees of the Fourth Amendment."

In their initial brief, Appellees denied that Constantine and Lane conclusively demonstrated that Congress validly abrogated the States' immunity for the type of claim at issue here. See Appellees' Brief at 36 (Constantine "holds only that Title II of the ADA validly abrogated Eleventh Amendment immunity 'as it applies to public higher education.'") (quoting Constantine, 411 F.3d at 490)). Notwithstanding their argument that Constantine and Lane did not conclusively resolve the abrogation issue, Appellees offered no argument that Congress had not in fact validly abrogated the States' Eleventh Amendment immunity.

Additionally, in their initial briefs to us, neither party discussed or even cited the Supreme Court's decision in United States v. Georgia, 546 U.S. 151 (2006). In Georgia, the Supreme Court noted that in prior decisions the Court had been split regarding whether Congress had the power under § 5 of the

47

Fourteenth Amendment to abrogate states' sovereign immunity for conduct that did not actually violate the Constitution.  See id. at 158-59.  The Georgia Court specifically held that "insofar as Title II creates a private cause of action for damages against the States for conduct that actually violates the Fourteenth Amendment, Title II validly abrogates state sovereign immunity." Id. at 159.  To give guidance to lower courts determining whether the Eleventh Amendment bars an ADA Title II claim, the Supreme Court provided a three-part test:

> [D]etermine . . . on a claim-by-claim basis, (1) which aspects of the State's alleged conduct violated Title II; (2) to what extent such misconduct also violated the Fourteenth Amendment; and (3) insofar as such misconduct violated Title II but did not violate the Fourteenth Amendment, whether Congress's purported abrogation of sovereign immunity as to that class of conduct is nevertheless valid.

Id.; see Babcock v. Michigan, 812 F.3d 531, 534-35 (6th Cir. 2016); see also Lyng v. Nw. Indian Cemetery Protective Ass'n, 485 U.S. 439, 445 (1988) (It is a "fundamental and longstanding principle of judicial restraint . . . that courts avoid reaching constitutional questions in advance of the necessity of deciding them."); Lors v. Dean, 746 F.3d 857, 864 (8th Cir. 2014) (noting that "the constitutional question of whether Title V of the ADA was a valid abrogation of sovereign immunity may be avoided altogether if the district court correctly determined that the

48

[ADA] claim fails on the merits").[28]  Because neither the parties nor the district court had addressed <u>Georgia</u> in their briefs, we requested that the parties file supplemental briefs explaining the impact of <u>Georgia</u> on the present case.

In their supplemental brief, Appellants suggest that in light of the district court's failure to apply the <u>Georgia</u> framework, "their claims for injunctive relief and damages should be reassessed by the district court, with instructions to apply the test set forth in <u>Georgia</u>, except for those claims which [the Fourth Circuit] may elect to grant summary judgment in favor of the plaintiffs."  Appellants' Supp. Brief at 15. Appellees, in their supplemental brief, do not deny that the <u>Georgia</u> framework governs the analysis of the abrogation issue to the extent that Appellants assert a claim for money damages. Nor do they explain how that analysis should apply to the facts of this case.  They contend that <u>Georgia</u> cannot affect the outcome of this appeal because none of the claims here are justiciable – an argument we have now rejected – and because any ADA liability would be duplicative of liability under the

---

[28] Although Eleventh Amendment immunity is designed "to protect the State from being subject to suit at all[,] the <u>Georgia</u> protocol may require the State to defend litigation before obtaining a ruling on immunity."  <u>Buchanan v. Maine</u>, 469 F.3d 158, 172 n.8 (1st Cir. 2006).

49

Rehabilitation Act to the extent that Eleventh Amendment immunity is not available.

In light of the existence of the unresolved issue of whether Congress has validly abrogated the States' Eleventh Amendment immunity for Title II claims of the type asserted here, we hold that dismissing Count One on Eleventh Amendment grounds, without utilizing the Georgia framework, was premature. Particularly since Appellees have not yet made any argument regarding how the Georgia framework would apply to the facts before us, we decline to apply Georgia in the first instance.

Appellees also argue that regardless of whether Congress validly abrogated South Carolina's Eleventh Amendment immunity regarding the type of claim asserted in Count One, we should affirm the dismissal of the BCB Members in light of the fact that no effective prospective relief was available as against these Appellees – as we have already discussed – and because Appellants have abandoned any claims for damages asserted against these Appellees.

We agree that Appellants abandoned any claim for damages in regard to their claims against Leatherman, Eckstrom, Chellis, and Cooper when they submitted memoranda to the district court explicitly representing that they were not seeking damages from them. See J.A. 1086 ("All of the relief requested by the Plaintiffs as to Defendant Cooper is prospective."); J.A. 1115

50

("Only prospective relief, and attorneys fees, are requested from [Chellis]."); J.A. 2240 ("[T]he only relief [Appellants] request from [Leatherman and Eckstrom] is injunctive relief."). We therefore affirm the dismissal of Counts One and Two against these Appellees – the individual-capacity claims as well as the official-capacity claims – on this basis.

We do not agree, however, that Appellants have abandoned their claims for money damages against Governor Haley (in her official capacity). In her memoranda to the district court supporting her motion to dismiss, Governor Haley suggested that Appellants were seeking money damages in their claims against her. See J.A. 290 ("If a plaintiff seeks only retrospective relief (such as monetary damages), then Ex Parte Young is not an available means of bringing suit against the state official."). It is true that Appellants' primary response was that the prospective relief fit within the Ex Parte Young requirements. But unlike they did with regard to the other BCB Members, Appellants did not specifically deny Governor Haley's contention that they sought retrospective relief as well. Indeed, they argued that Governor Haley could be liable for the past actions of others, suggesting that at least part of the relief they were claiming was retrospective. See, e.g., J.A. 387 ("Plaintiffs have presented evidence that Haley and her predecessor, Mark Sanford, had actual or, at least constructive, knowledge of the

51

violations alleged in the amended complaint."). On reply, Appellees argued that Appellants had "failed to present any opposition" to the argument that they did not seek injunctive relief against Governor Haley except with regard to Count Six. J.A. 717.

In further support of their abandonment proposition, Appellees point to a statement by Appellants' counsel, made to the district court on September 23, 2014, that Appellants' lawsuit was not requesting damages other than against the Babcock Center. As Appellants point out, however, this statement was made well after Governor Haley – and the other BCB Members – had been dismissed. And at oral argument before us Appellants' counsel denied that her statement was intended to encompass the claims asserted against the BCB Members. In our view, counsel's ambiguous statement made at the summary-judgment hearing is simply not clear enough to constitute an abandonment of Appellants' damage claims asserted against Governor Haley in her official capacity. See Doe v. Kidd, 501 F.3d 348, 354 (4th Cir. 2007) ("Federal law is well-settled that waiver is the voluntary and intentional relinquishment of a known right, and courts have been disinclined lightly to presume that valuable rights have been conceded in the absence of clear evidence to the contrary." (alteration and internal quotation marks omitted)). Cf. Santos v. Frederick Cty. Bd. Of Comm'rs, 725

52

F.3d 451, 463 (4th Cir. 2013) (holding that counsel's ambiguous statement during argument on summary judgment motion did not constitute waiver); Feikema v. Texaco, Inc., 16 F.3d 1408, 1417 (4th Cir. 1994) (holding no waiver of claim for damages when, although "[t]he principal aim" of the arguments opposing the motion to dismiss were directed at "whether they could obtain injunctive relief," the record was ambiguous regarding whether they intended to continue to pursue a damages claim). We thus decline to affirm the dismissal of Count One as against the Governor in her official capacity on this basis but rather vacate the dismissal of that count against the Governor.

Regarding Count Two, Appellants maintain that states waive Eleventh Amendment immunity against suit under § 504 of the Rehabilitation Act by accepting federal financial assistance, as South Carolina did here with regard to Medicaid. See Constantine, 411 F.3d at 490-96. For their part, Appellees do not dispute that South Carolina has waived any Eleventh Amendment immunity regarding Count Two, but they argue that the district court properly ruled that the BCB Members were not named as defendants in Count Two. See Appellees' brief at 36-37 ("States do waive their Eleventh Amendment immunity under the Rehabilitation Act by accepting funds, see Constantine, 411 F.3d at 490-96, but Plaintiffs' Rehabilitation Act claim is not asserted against any of the BCB Members."). We do not read the

53

district court opinions as reaching that conclusion, however. It is true that in the parts of the district court's opinions describing the different counts in the complaint, the district court did not identify the BCB Members as defendants. Later in its opinions, though, the court appeared to recognize that Count Two named the BCB Members. See J.A. 1135 (noting that those "who were members of the [BCB]" were named as defendants in Count Two); J.A. 2371 (noting that Leatherman and Eckstrom were named as defendants in Count Two). In any event, review of the amended complaint shows that the BCB Members were among the defendants as to Count Two. See J.A. 225 (allegation in Count Two of amended complaint that BCB "failed to insure that the funds allocated to [DDSN] were spent as appropriated by the General Assembly to provide services, despite warnings from the South Carolina Legislative Audit Council that [DDSN] was spending those funds improperly for the purchase of real estate"). We therefore vacate the dismissal of Governor Haley as a defendant regarding Count Two.

IV.

In sum, for the foregoing reasons, we vacate the district court order granting summary judgment against Appellants on Counts One through Seven on justiciability grounds, and remand for further proceedings consistent with this opinion. We also vacate the district court order to the extent that it dismisses

54

Counts One and Two against Governor Haley on the basis of Eleventh Amendment immunity. However, we affirm the dismissal of the official- and individual-capacity claims against Leatherman, Eckstrom, Chellis, and Cooper.

AFFIRMED IN PART,
VACATED IN PART,
AND REMANDED