**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

## No. 20-1163

JOHNNY TIMPSON, by and through his Conservator, Sandra Timpson; SANDRA TIMPSON, in her individual capacity,

    Plaintiffs – Appellants,

v.

ANDERSON COUNTY DISABILITIES AND SPECIAL NEEDS BOARD; MICHELLE RICKETSON, Chairman of The Anderson County Disabilities and Special Needs Board; DALE THOMPSON, former Executive Director of The Anderson County Disabilities and Special Needs Board; JERREL LYNN KING, current Director of The Anderson County Disabilities and Special Needs Board; SOUTH CAROLINA DEPARTMENT OF DISABILITIES AND SPECIAL NEEDS, DDSN; GARY C. LEMEL, Chairman, DDSN Commission; BEVERLY BUSCEMI, former Director of the South Carolina Department of Disabilities and Special Needs, in her individual capacity; SOUTH CAROLINA DEPARTMENT OF HEALTH AND HUMAN SERVICES; CHRISTIAN SOURA, former Director of the South Carolina Department of Health and Human Services, in his individual capacity; GREENVILLE COUNTY DISABILITIES AND SPECIAL NEEDS BOARD; ROBERT M. ARIAIL, Chairman of the Board of Thrive Upstate, formerly known as the Greenville County Disabilities and Special Needs Board; TYLER REX, Director of Thrive Upstate; THRIVE UPSTATE; HENRY DARGAN MCMASTER, Governor of the State of South Carolina in his official capacity; MARY POOLE, Director of the South Carolina Department of Disabilities and Special Needs; JOSHUA BAKER, Director of the South Carolina Department of Health and Human Services; NIKKI HALEY, in her individual capacity,

    Defendants – Appellees,

and

UNKNOWN ACTORS, at the Anderson Disabilities and Special Needs Board; UNKNOWN ACTORS, at the Greenville County Disabilities and Special Needs Board and/or Thrive Upstate,

Defendants.

---

Appeal from the United States District Court for the District of South Carolina, at Greenville. Donald C. Coggins, Jr., District Judge. (6:16-cv-01174-DCC)

---

Argued: January 25, 2022                                    Decided: April 7, 2022

---

Before MOTZ, AGEE, and WYNN, Circuit Judges.

---

Affirmed in part, vacated in part, and remanded by published opinion. Judge Agee wrote the opinion in which Judge Motz and Judge Wynn joined.

---

**ARGUED:** Patricia L. Harrison, Cleveland, South Carolina, for Appellants. Patrick John Frawley, DAVIS FRAWLEY, LLC, Lexington, South Carolina, for Appellees. **ON BRIEF:** Robert C. Childs, III, Greenville, South Carolina, for Appellants. William H. Davidson, II, Kenneth P. Woodington, DAVIDSON, WREN & DEMASTERS, P.A., Columbia, South Carolina, for Appellees South Carolina Department of Disabilities and Special Needs, Lemel, and Buscemi. Damon C. Wlodarczyk, RILEY, POPE & LANEY, LLP, Columbia, South Carolina, for Appellees South Carolina Department of Health and Human Services and Soura. James W. Logan, Jr., LOGAN & JOLLY, LLP, Anderson, South Carolina, for Appellee Henry McMaster, Governor of the State of South Carolina. Knox L. Haynsworth, III, BROWN, MASSEY, EVANS, MCLEOD & HAYNSWORTH, LLC, Greenville, South Carolina, for Appellees Thrive Upstate, formerly the Greenville County Disabilities & Special Needs Board, Arial, and Rex. Karl S. Bowers, Jr., BOWERS LAW OFFICE, LLC, Columbia, South Carolina, for Appellee Nikki Haley.

---

AGEE, Circuit Judge:

Johnny and Sandra Timpson (the "Timpsons") appeal from various preliminary orders of the district court and the entry of directed verdicts on several of their claims. For the following reasons, we affirm the district court's judgment in part, vacate it in part, and remand for further proceedings consistent with this opinion.

I.

A.

Before turning to the Timpsons' allegations, we first summarize the pertinent regulatory framework. Medicaid, established as part of the Social Security Act in 1965, "is a cooperative federal-state public assistance program that makes federal funds available to states electing to furnish medical services to certain impoverished individuals." *Mowbray v. Kozlowski*, 914 F.2d 593, 595 (4th Cir. 1990). The state agency responsible for administering and supervising Medicaid in South Carolina is the South Carolina Department of Health and Human Services ("DHHS").[1] DHHS, in turn, contracts with the South Carolina Department of Disabilities and Special Needs ("DDSN")[2]—a seven-member commission appointed by the Governor[3]—to operate the state's treatment and training programs for individuals with intellectual and related disabilities. Relevant here,

---

[1] Christian Soura was DHHS's Director during the relevant timeframe of 2014 to 2017, at which point current Director Joshua Baker succeeded him.

[2] Beverly Buscemi was DDSN's Director from 2009 to 2017.

[3] Nikki Haley was the Governor of South Carolina from 2011 to 2017 and later served as the United States Ambassador to the United Nations from 2017 to 2018. Henry McMaster has served as Governor since 2017.

3

DDSN contracts with the Anderson County Disabilities and Special Needs Board (the "Board")[4] to "offer[] an array of services to Medicaid-eligible clients." J.A. 2427. DDSN funds the Board, which follows DHHS's and DDSN's policies and procedures.

Although many Medicaid benefits are available only to those in intermediate care facilities ("ICF"), Congress has established a waiver program that allows states to provide home- and community-based services to eligible persons. The Medicaid program requires states to inform individuals who qualify for ICF services "of the[se] feasible alternatives, if available under the waiver." 42 U.S.C. § 1396n(c)(2)(C).

B.

Johnny Timpson ("Johnny") was born with severe intellectual disabilities and cerebral palsy.[5] In 1968, when Johnny was ten years old, DDSN placed him in an ICF called the Whitten Center, where he remained for almost thirty years. In response to a 1997 Department of Justice investigation reporting systemic abuse and neglect at the facility, DDSN moved Johnny to a separate system of Board-operated group homes, including Tiny Greer.

While under the Board's care, Johnny exhibited troubling behaviors. He set fires, threatened suicide, and engaged in sexually deviant conduct and elopements. Johnny was hospitalized in 2002 after starting a fire and received sex education courses from 2010 to

---

[4] Dale Thompson was the Board's Director when Johnny Timpson lived at the Tiny Greer group home ("Tiny Greer")—where he alleges he was mistreated. Thompson resigned in 2015 and has since worked for Thrive Upstate ("Thrive"), formerly known as the Greenville County Disabilities and Special Needs Board.

[5] A psychologist has estimated that Johnny "operates on a grade equivalent similar to that of a pre-school student." J.A. 1758.

4

2013, despite his limited mental capacity. According to the Timpsons, even though Johnny had regular contact and visits with his family, the Board did not notify them about any of these events.

On May 11, 2013, staff at Tiny Greer discovered burns on Johnny's wrists. The Board notified Sandra Timpson ("Sandra"), one of Johnny's sisters, but insisted that the injuries were "minor." J.A. 6141. Sandra believed Johnny had second-degree burns based on photographs a staff member sent her. So she drove to Tiny Greer to speak with him. Johnny told her that he did not burn himself, that the staff had injured him, and that he was telling the truth. The Tiny Greer staff, on the other hand, reiterated that Johnny had burned himself. Sandra reported this and several other incidents to the police. But Johnny consistently changed his story, later insisting that his injuries were self-inflicted.

On June 12, 2013, Sandra secured a health care power of attorney over Johnny,[6] and the Board discharged him to her care on August 30, 2013. While in her care, the only service the Board arranged for Johnny to attend was Thrive's program. According to the Timpsons, neither the Board nor Johnny's new case manager told Sandra that he was entitled to receive services from a non-DDSN-affiliated provider. Nor, they allege, was she told of the "feasible alternatives" of receiving in-home and behavior-support services, or that Sandra could be paid for providing care in her home. J.A. 258.

---

[6] Johnny executed the health care power of attorney, authorizing Sandra to make health care decisions for him and to obtain his medical records. The power of attorney did not authorize Sandra to make financial decisions on his behalf.

C.

The Timpsons brought suit in South Carolina state court in February 2016. After the case was removed to the United States District Court for the District of South Carolina,[7] the Timpsons filed an amended complaint, naming fourteen Defendants (ten individuals[8] and four agencies[9]) and alleging five causes of action: (1) negligence and gross negligence under the South Carolina Tort Claims Act ("SCTCA"); (2) violations of the Americans with Disabilities Act ("ADA"); (3) violations of the Rehabilitation Act ("RA"); (4) violations of the South Carolina Administrative Procedures Act[10]; and (5) violations of various Medicaid statutory and regulatory rights pursuant to 42 U.S.C. § 1983. The amended complaint alleged misconduct collectively against all Defendants, without citing any specific acts on the part of any specific individual. Defendants answered, asserting various affirmative defenses and denying liability.

From the start, there was confusion about whether the Timpsons had sued then-Governor Haley in her official capacity as Governor or in her individual capacity. While she sought clarification from the district court, the Timpsons noticed her deposition. In response (and after she had left state office to assume her position at the United Nations), then-Ambassador Haley filed a motion for a protective order, arguing that Governor McMaster was automatically substituted as a party upon her resignation. The Timpsons

---

[7] The federal courts have subject matter jurisdiction under 28 U.S.C. §§ 1331, 1367.

[8] These included then-Governor Haley, various members of the Board, as well as the Directors of DDSN, DHHS, and Thrive.

[9] These included the Board, DDSN, DHHS, and Thrive.

[10] The Timpsons' Administrative Procedures Act claims are not at issue in this appeal.

acknowledged that Governor McMaster should automatically be substituted for the claims against then-Ambassador Haley in her official capacity as Governor, but stated that they were still "entitled to take the deposition of Nikki Haley to establish facts alleged in their amended complaint and to determine whether she *may be liable*, in her individual capacity, for any of the claims alleged in the amended complaint." J.A. 446 (emphasis added).

The district court ordered that, before requiring then-Ambassador Haley to submit to an oral deposition, the Timpsons should first pose ten written interrogatories. The court then directed the parties to submit her answers and brief whether the deposition should proceed or if summary judgment was appropriate as to the Timpsons' individual capacity claims. *See* J.A. 1016 (explaining that "the interrogatory procedure was the most efficient and reasonable means of determining whether Defendant Haley had any relevant information as a threshold matter" (citing *Olivieri v. Rodriguez*, 122 F.3d 406, 409 (7th Cir. 1997) (adopting a similar approach for deposing high-ranking public officials))). In reviewing the parties' submissions, the court found the Timpsons had "not ask[ed] *any* questions about Defendant Haley's knowledge of [Johnny's] care or the provision of services to him." J.A. 1020.[11] Instead, they posed "a variety of questions related to her knowledge, while Governor, of various alleged improprieties in the administration of Medicaid waiver services." *Id.* Unsurprisingly, then-Ambassador Haley's answers "provide[d] no evidence whatsoever of her personal involvement in the issues raised in the

---

[11] Before submitting the interrogatories, the Timpsons represented that, "[i]f Nikki Haley testifies under oath that she had no personal knowledge or involvement in the matters alleged in the amended complaint, then her deposition should be short." J.A. 447.

case at bar." *Id.* And because there was no evidence that she acted personally in the alleged deprivation of Johnny's rights, the court entered judgment in her favor.

The remaining Defendants moved for summary judgment, and the Timpsons moved for partial summary judgment. After argument, the district court directed the Timpsons to file "supplemental briefing on . . . how [the § 1983] claims survive[d], that is, what the claim[s] [were] and what the evidence [was] that create[d] at least a genuine issue of material fact." J.A. 4651. The Timpsons submitted a brief, which the district court criticized as "not accurately address[ing] any of those issues" and instead, much like their amended complaint, amounting "again, [to] a diatribe against the system." J.A. 4719.

The district court granted summary judgment for most of the Defendants on almost all of the Timpsons' claims and denied the Timpsons' motion for partial summary judgment.[12] Relevant here, the court granted summary judgment on all of the RA claims. At a later hearing, the district court dismissed all of the remaining claims, with these exceptions:

---

[12] While this case was before the district court, Johnny filed an unrelated administrative appeal with DHHS to increase the number of hours he received care each week. He prevailed and later moved the district court to award interim attorney's fees, arguing his administrative agency action was "both useful and of a type ordinarily necessary to advance the civil rights litigation to the stage it reached." J.A. 690. The court denied the motion. Though the Timpsons briefly appear to challenge this ruling in their opening brief, *see* Opening Br. 36, 60, their efforts are so conclusory and vague that we conclude they have waived any challenge. *See United States v. Diaz*, 865 F.3d 168, 179 (4th Cir. 2017) (treating an issue as waived when "the essential argument [was] contained in one sentence"); *Eriline Co. S.A. v. Johnson*, 440 F.3d 648, 653 n.7 (4th Cir. 2006) (explaining that a single "conclusory remark" in a brief is "insufficient" to constitute an argument). As discussed below, such vague challenges are woven throughout the Timpsons' briefs.

1. ADA Claims[13] against the Board, DDSN, DHHS, Thrive, and Governor McMaster;

2. SCTCA Claims against the Board, DDSN, DHHS, Thrive, and Governor McMaster; and

3. Section 1983 Claims against Thompson and Buscemi.

At a pretrial hearing, the court barred testimony unrelated to Johnny and the facilities in which he was placed. The court also prohibited the Timpsons from presenting evidence related to alleged state-wide violations of law, admonishing, "You did not bring this as a class action. You did not bring this with [Johnny] as a representative plaintiff for all other[s] similarly situated. You are not going to put the system on trial." J.A. 4766.[14]

The remaining Defendants objected to Johnny testifying at trial, arguing he was incompetent. The district court held a hearing, during which Johnny answered some basic questions correctly (including the name of the President of the United States and the fact that he lived with his sister), others incorrectly (including his year of birth and the current year), and acknowledged it was wrong to lie. The court ruled that the probative value of Johnny's testimony was outweighed by the prejudice it would cause the Defendants. It also found that the jury was likely to be confused by Johnny's "limited ability to communicate." J.A. 4814–15.

### D.

At trial, the district court allowed Johnny to answer questions only about "very basic

---

[13] The district court found that the Timpsons' RA and ADA claims were subject to the one-year statute of limitations found in South Carolina's Human Affairs Law.

[14] The district court also denied the Timpsons' claims for injunctive relief. They do not meaningfully challenge this decision in their opening brief and have thus waived it. *See Diaz*, 865 F.3d at 179; *Eriline*, 440 F.3d at 653 n.7.

things" such as "his name, where he lives, who [he] lives with, . . . [and] if his arms were injured." J.A. 4815.

Although the Timpsons had designated Deborah McPherson (a former DDSN Commissioner), Lennie Mullis (a behavior support provider), and Randy Thomas (a former instructor at the South Carolina Criminal Justice Academy) as hybrid witnesses prior to trial and disclosed the general subject matter on which they were expected to testify, none of these witnesses filed a written report. The district court thus excluded all three from presenting expert testimony. Moreover, it excluded Mullis altogether, but allowed McPherson and Thomas to testify as fact witnesses, though neither knew Johnny.

At the end of the Timpsons' case, the district court entered directed verdicts in favor of almost all of the remaining Defendants on almost all of the claims. The only claims that remained were the Timpsons' ADA claim against the Board and SCTCA claims against the Board and DDSN.[15] The jury returned verdicts for the Defendants on these remaining claims.

The Timpsons moved for reconsideration, which the district court denied. They filed a timely notice of appeal. We have jurisdiction under 28 U.S.C. § 1291.

---

[15] The court instructed the jury that the Board and DDSN could be liable under the SCTCA if the Timpsons had shown the agencies failed "to exercise slight care" or consciously failed "to do something which is incumbent upon one to do or the doing of a thing intentionally that one ought not to do." J.A. 3714.

II.

The Timpsons' briefs are meandering and conclusory. They largely consist of one-sentence arguments and sparse (or no) citations to the record.[16] That said, as best we can discern, it appears the Timpsons have presented five preserved issues for our review. First, they challenge the district court's rulings on the applicable statutes of limitations for their RA and ADA claims. Second, they submit the district court abused its discretion in excluding and limiting Johnny's and the hybrid witnesses' testimonies and in determining whether then-Ambassador Haley should have been deposed. Third, the Timpsons assert the district court improperly instructed the jury as to the duty owed under the SCTCA. Fourth, they argue the district court improperly dismissed their RA claims. And fifth, the Timpsons submit the district court erred in dismissing their § 1983 claims. We address each in turn.

A. The Statutes of Limitations

Before turning to the Timpsons' specific challenges, we first set out the relevant limitations periods the district court applied to their claims. Because Title II of the ADA has no statute of limitations, federal courts "borrow the state statute of limitations that applies to the most analogous state-law claim." *A Soc'y Without A Name v. Virginia*, 655

---

[16] For example, at one point in their opening brief, the Timpsons include the following assertion: "The Lower Court erred as a matter of law in failing to apply the guidelines set forth in [*Blessing v. Freestone*, 520 U.S. 329 (1997)], to determine whether other provisions of the Medicaid Act create a private right enforceable under § 1983." Opening Br. 60. They never delineate the *Blessing* guidelines or how they would apply. Nor do they provide any argument about how the district court failed to apply them. The Timpsons likewise include no record citations to guide our review. As a result, we find this claim—and others like it scattered throughout the Timpsons' briefs—waived. *Diaz*, 865 F.3d at 179; *Eriline*, 440 F.3d at 653 n.7.

11

F.3d 342, 347 (4th Cir. 2011); *accord McCullough v. Branch Banking & Tr. Co.*, 35 F.3d 127, 129 (4th Cir. 1994).[17] Here, the district court determined that the South Carolina Human Affairs Law's one-year statute of limitations applied to the Timpsons' ADA and RA claims. *See* S.C. Code Ann. § 1-13-90(d)(6). The district court also applied § 15-3-40 of the South Carolina Code to extend the applicable limitations periods for Johnny's claims by five years due to his intellectual disability. Therefore, because the Timpsons filed this suit in February 2016, the district court allowed Johnny to present his ADA and RA claims extending back to February 2010, and Sandra to present hers extending back to February 2015.[18]

The Timpsons challenge two aspects of the district court's statutes of limitations rulings. First, they argue the district court erred in finding the South Carolina Human Affairs Law was the most analogous state law to their ADA and RA claims. Second, they argue the district court erred in failing to apply South Carolina's discovery rule to toll the applicable limitations periods.

---

[17] The Court considers RA and Title II ADA claims together "because these provisions impose the same integration requirements." *Pashby v. Delia*, 709 F.3d 307, 321 (4th Cir. 2013).

[18] As for the Timpsons' other causes of action, all SCTCA claims must be filed "within two years after the date the loss was or should have been discovered." S.C. Code Ann. § 15-78-110. And § 1983 claims in this context are subject to a three-year statute of limitations. *See Wilson v. Garcia*, 471 U.S. 261, 271 (1985); S.C. Code Ann. § 15-3-530(5). As a result, Johnny was allowed to present claims extending back to: (a) February 2008 for his § 1983 claims; and (b) February 2009 for his SCTCA claims. Sandra was allowed to present claims extending back to: (a) February 2013 for her § 1983 claims; and (b) February 2014 for her SCTCA claims.

## 1. The Most Analogous State Law

We agree with the Timpsons that the district court erred in finding that their ADA and RA claims alleging discrimination in the provision of public services and retaliation were subject to the South Carolina Human Affairs Law's one-year statute of limitations. Although "the most analogous [state law claim for statute of limitations purposes] need not be identical," we have made clear that the controlling state legislation is that which provides substantially "the same rights and remedies" as the ADA. *Wolsky v. Med. Coll. of Hampton Roads*, 1 F.3d 222, 224–25 (4th Cir. 1993). In *Semenova v. Maryland Transit Administration*, 845 F.3d 564 (4th Cir. 2017), we held that when a state's anti-discrimination statute "does not contain a cause of action for disability discrimination in the provision of public services, the closer state-law analog to [an ADA] claim is a general civil action." *Id.* at 566.

The South Carolina Human Affairs Law prohibits disability discrimination in employment, S.C. Code Ann. § 1-13-80, and in conducting certain medical examinations or inquiries of a job applicant or employees, S.C. Code Ann. § 1-13-80, not in the provision of public services. Moreover, South Carolina's public accommodations statute provides that "[a]ll persons shall be entitled to the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodation . . . without discrimination or segregation on the ground of *race, color, religion, or national origin*." S.C. Code Ann. § 45-9-10(A) (emphasis added); *id.* § 45-9-10(B)(3) (defining "public accommodation" as "any hospital, clinic, or other medical facility which provides overnight accommodations"). That statute is silent about claims for

13

disability discrimination. As a result, under *Semenova*, the district court erred in applying the South Carolina Human Affairs Law's statute of limitations rather than the three-year period for general civil actions. *See id.* § 15-3-530(5). We first address the implications of this error as it applies to Sandra before turning to Johnny's claims.

Though the Timpsons vaguely assert that this decision prevented Sandra from recovering for retaliatory acts before 2015, they mostly fail to specify *what* retaliation she suffered or how *she* (and not Johnny) was harmed. *See* Opening Br. 38 ("Because of this error, the jury was not allowed to award damages for retaliatory acts against Sandra before 2/23/2015, when Defendants concealed records, delayed Johnny's discharge, refused to provide records, reported to law enforcement that Sandra was exploiting her brother,[19] [and] failed to investigate sexual assaults[.]"). The Timpsons' sparse record cites offer little guidance in our review. *See Rodriguez-Machado v. Shinseki*, 700 F.3d 48, 49–50 (1st Cir. 2012) (per curiam) ("Essentially, [counsel] is asking us to do one of two things: accept what she says as gospel or mine the record ourselves to confirm the truth of her story—and there is no reason for us to do either. . . . [D]oing [counsel's] work for her is not an option, since that would divert precious judge-time from other litigants who could have their cases resolved thoughtfully and expeditiously because they followed the rules."); *United States*

---

[19] The only record citation to support this claim in the opening brief makes no mention of such a report. *See* Opening Br. 19 (citing J.A. 2189 (detailing various incidents involving Johnny while he was under the Board's care)). There was a note in a case status report suggesting that Angela Timpson (also Johnny's sister) had told law enforcement that she believed Sandra "was in the process of building a new home and . . . felt that [Johnny's complaints were] a means for Sandra Timpson to be able to take Johnny and be able to access his finical [sic] monies." J.A. 1758. The Timpsons did not name either Angela or the Anderson County Sherriff's Office (who authored the report) as Defendants.

*v. Dunkel*, 927 F.2d 955, 956 (7th Cir. 1991) (per curiam) (explaining that "[j]udges are not like pigs, hunting for truffles buried in [the record]").

Still, Sandra appears to have made one potential claim for ADA and RA retaliation that would be impacted by the district court's statute of limitations ruling: that Defendants—which ones is unclear—"failed to inform [her] of feasible alternatives under the waiver." Opening Br. 38. In the amended complaint, the Timpsons generally alleged "Defendants have failed to inform Sandra of . . . feasible alternatives and to provide sufficient services in the home so that she can return to work and so that her brother can avoid institutionalization." J.A. 258. "Sandra repeatedly complained about Defendants [sic] conduct towards Johnny. In retaliation for those complaints the defendants withheld and delayed services to Johnny for Sandra when she took him into her home" in August 2013. J.A. 259. The amended complaint concluded that "Defendants have retaliated against persons, including Johnny and Sandra, who have advocated for waiver participants and employees who have reported abuse, neglect and exploitation[, and] have experienced reprisals, and these wrongful acts by Defendants have resulted in injury to Johnny and Sandra." J.A. 266; *see also* J.A. 2729 (Sandra's affidavit claiming she "was never told that family members or friends could be paid to provide personal care attendant hours or that if [she] was appointed as Johnny's guardian, [she] could not be paid to provide attendant care"). Therefore, we vacate the district court's dismissal of Sandra's ADA and RA retaliation claims that occurred between February 23, 2013, and February 23, 2015. On remand, we direct Sandra to specify which Defendants, if any, she claims retaliated against her during this period and to state, with specificity, how they did so.

15

We affirm, however, the district court's dismissal of Johnny's claims because he has failed to show how this ruling prejudiced him. The Timpsons vaguely allege in their opening brief that, "[a]s a result of [the district court's ruling], the jury also did not consider Johnny's pre-2010 claims for ongoing ADA and [RA] violations." Opening Br. 38. They make no mention of what these claims were or upon what facts they were based. The lone reference in their opening brief to an incident during the 2008 through 2009 period (incorporating the added two years Johnny's ADA and RA claims would have received had the district court applied the correct statute of limitations) was a claim that his "surrogate was not informed of his elopements and threat to injure himself in 2008." Opening Br. 11. But this appears to be a reference to the consent-based claims the district court expressly rejected because the Timpsons failed to allege any issue related to it in their amended complaint. *See* J.A. 5811 ("[I]n the amended complaint there is no claim pled involving consent," meaning "anything related to consent is really not before the [c]ourt."). And the Timpsons have waived any challenge to this ruling by failing to raise it on appeal. Therefore, Johnny has no ADA or RA claims for the additional time period.

## 2. The Discovery Rule

The Timpsons similarly failed in framing their arguments under the discovery rule. *See Young v. S.C. Dep't of Corr.*, 511 S.E.2d 714, 718–19 (S.C. Ct. App. 1999) (applying the discovery rule—that the statute of limitaitons begins to run when a cause of action reasonably ought to have been discovered—to claims brought under the SCTCA). They summarily assert, "The Lower Court erred in ruling that the state tolling statute and the discovery rule were mutually exclusive, prohibiting Johnny from recovering for any injury

16

prior to 2010 and Sandra from recovering for injuries prior to 2015." Opening Br. 43. But they never state with any specificity what those injuries were or how they would have supported cognizable claims. Because they have claimed no prejudice from the district court's ruling, we affirm on this ground as well.

## B. Limited and Excluded Testimony

Moving to the Timpsons' second point of error, they claim the court improperly: (1) limited Johnny's testimony; (2) limited and excluded the hybrid witnesses' testimonies; and (3) prevented them from taking then-Ambassador Haley's deposition. We review each in turn, cognizant that "evidentiary rulings are entitled to substantial deference and will not be reversed absent a clear abuse of discretion," which occurs "only when the district court act[s] arbitrarily or irrationally." *United States v. Moore*, 27 F.3d 969, 974 (4th Cir. 1994) (internal quotation marks omitted).

### 1. Johnny's Testimony

A witness's competency to testify is a threshold question of law lying exclusively in the trial court's discretion. *United States v. Odom*, 736 F.2d 104, 111 (4th Cir. 1984). When a party questions a witness's competency, the trial court must satisfy itself that the witness is competent to testify. *Id.* Though it did not need to conduct a formal hearing, the court did so here and found it "reasonable to question whether or not [Johnny] possesse[d] the legal competence to testify." J.A. 4783.

In response to the court's questions at the hearing, Johnny correctly stated his name and age, recognized the importance of telling the truth, identified the current President of the United States, and confirmed that he lived with his sister. He could not, however, name

17

his state of residence, state the current year or his year of birth, identify his claims with any particularity beyond the fact that they related to the arm-burning incident, or define what it meant to swear an oath. The transcript indicates several times where Johnny's responses were "inaudible" or the court otherwise struggled to understand him. *See* J.A. 4784–88, 4813.

After hearing argument, the court found that Johnny met "the minimum qualifications of competence to the extent that he underst[ood] the importance of telling the truth, and that telling the truth is the right thing to do, that lying is wrong, and that . . . not telling the truth would carry with it negative consequences." J.A. 4814. And that was enough "to get over the low bar" of competency. *Id.* But the court also determined that Johnny was "not a reliable historian based upon his response . . . about his date of birth, and his inability to tell [the court] what state he lives in and some of the other responses." *Id.* As such, the court found that the probative value of Johnny's testimony would be substantially outweighed by the prejudice involved:

> [There would be] confusion to the jury in that . . . it would likely result in both the direct and cross examinations being nothing more than testimony by the respective attorneys with Mr. Timpson having limited ability to communicate either his agreement or disagreement with what the attorney was propounding in their question.

J.A. 4815. As a result, the court allowed the Timpsons to call Johnny, but limited his testimony to "very basic things" like "his name, where he lives, who [he] lives with, how long he's lived there," and "if his arms were injured." *Id.*

The district court did not abuse its discretion in doing so. *See Odom*, 736 F.2d at 111 (stating that the court may consider "the witness' demeanor and testimony at the time,

18

his ability to recall, his knowledge of the facts, and his ability to narrate, then resolve the issue as one of credibility more than one of competency"). Indeed, Johnny's testimony during trial supported the court's decision to limit it. For example, during his direct examination, when asked how old he was, Johnny responded:

A: I'm 50.
Q: Sir?
A: 50. I 51. I'm 50. I'm 58.
Q. Are you 61?
A: 58.
Q: You think you're 58.
A: (Witness moves head up and down.)

J.A. 5480. Johnny was 61 years old at the time.

And like the preliminary hearing, the courtroom reporter repeatedly stated during Johnny's trial testimony that he was "undiscernible" and that she could not understand him. *See* J.A. 5481–82, 5485–86, 5488, 5490. When asked if he could read and write, Johnny responded, "Yes. No. . . . I can read. I can read. I can read." J.A. 5485. But when asked to do so, he responded "I didn't learn that." J.A. 5486. Given these inconsistent answers to simple questions coupled with the difficulty in understanding Johnny, we have no difficulty concluding the district court did not abuse its discretion in limiting his testimony.

The Timpsons have also failed to show they were prejudiced by the court's ruling. They have made no proffer of what facts Johnny would have testified about that were not already in evidence. Nor have they detailed how those facts would have supported their claims. *See Nicholas v. Wyndham Int'l, Inc.*, 373 F.3d 537, 542–43 (4th Cir. 2004) (finding no abuse of discretion as to the denial of a discovery request where the complaining party

19

"ha[d] not been substantially prejudiced"). Therefore, we affirm the district court's limitation of Johnny's testimony during trial on this alternate ground as well.

## 2. The Hybrid Witnesses

Nor did the district court abuse its discretion in excluding in part and limiting in part the testimonies of the Timpsons' hybrid witnesses. Federal Rule of Civil Procedure 26(a)(2)(B) requires any party who identifies a witness it may call at trial to include "a written report—prepared and signed by the witness—if the witness is one retained or specially employed to provide expert testimony in the case." *See also* Fed. R. Civ. P. 26 advisory committee's note to 1993 amendment ("The requirement of a written report in paragraph (2)(B) . . . applies only to those experts who are retained or specially employed to provide [expert] testimony . . . or whose duties as an employee of a party regularly involve the giving of such testimony.").

Hybrid witnesses—fact witnesses with expertise that will inform their testimony—do not fall under Rule 26(a)(2)(B)'s purview. But most witnesses do not qualify as hybrid witnesses. *See Indianapolis Airport Auth. v. Travelers Prop. Cas. Co. of Am.*, 849 F.3d 355, 371 (7th Cir. 2017) ("[H]ybrid fact/expert witnesses . . . must testify from the personal knowledge they gained on the job," and "[t]he district court certainly may preclude these witnesses from testifying beyond the scope of facts they learned and opinions they formed during the course of their project duties."); *Downey v. Bob's Disc. Furniture Holdings, Inc.*, 633 F.3d 1, 6 (1st Cir. 2011) (holding that a hybrid witness whose opinion testimony arose "not from his enlistment as an expert but, rather, from his ground-level involvement in the events giving rise to the litigation" fell "outside the compass of Rule 26(a)(2)(B)").

If a party wants to present opinion evidence through a hybrid witness, it still must disclose: "(i) the subject matter on which the witness is expected to present evidence under Federal Rule of Evidence 702, 703, or 705; and (ii) a summary of the facts and opinions to which the witness is expected to testify." Fed. R. Civ. P. 26(a)(2)(C). Failure to comply with either requirement typically will result in mandatory exclusion. *See* Fed. R. Civ. P. 37(c)(1); *S. States Rack & Fixture, Inc. v. Sherwin-Williams Co.*, 318 F.3d 592, 595–96 (4th Cir. 2003).

The Timpsons' hybrid witness disclosures failed to satisfy Rule 26(a)(2)(C)(ii). The disclosures included only "the subject matter on which" the Timpsons expected McPherson, Mullis, and Thomas to testify. Fed. R. Civ. P. 26(a)(2)(C)(i); *see* J.A. 373–75, 378–79. At no point, however, did the disclosures set out "a summary of the facts and opinions to which" each was expected to testify. Fed. R. Civ. P. 26(a)(2)(C)(ii). And the Timpsons cite no record evidence in their briefs before us to support their broad claim that they satisfied Rule 26(a)(2)(C)'s requirements in full. Thus, the district court did not abuse its discretion in preventing the claimed hybrid witnesses from providing expert testimony.

But even if the Timpsons had properly disclosed McPherson, Mullis, and Thomas, the district court would not have erred in holding they failed to qualify as hybrid witnesses. None had any relevant factual evidence pertaining to the Timpsons' claims. McPherson and Thomas had never met Johnny. And Mullis had only interacted with him briefly seventeen years before trial (well outside the statutes of limitations). Thus, their only involvement in the case occurred in the context of having been hired to provide their opinions, meaning the Timpsons should have produced expert reports for each under Rule

21

26(a)(2)(B). Because they failed to do so, the district court properly excluded these witnesses from offering their expert opinions during trial.

### 3. Deposing Then-Ambassador Nikki Haley

We next consider the Timpsons' argument that the district court erred in denying their request to depose then-Ambassador Haley. "[F]ederal courts have consistently held that, absent extraordinary circumstances, a government decision-maker will not be compelled to testify about [her] mental processes in reaching a decision, including the manner and extent of [her] study of the record and [her] consultations with subordinates." *Franklin Sav. Ass'n v. Ryan*, 922 F.2d 209, 211 (4th Cir. 1991) (internal quotation marks omitted). That practice was especially appropriate here because Haley, in her role as Governor, was "not an official with responsibility for" decisions relating to "service levels of waiver participants," determinations of services for specific patients, or "provid[ing] funding for [patients] to live outside of a congregate setting." *Kobe v. Haley*, 666 F. App'x 281, 299 (4th Cir. 2016) (per curiam). Nor did she "have the authority to change them." *Id.* What's more, the Timpsons presented no theory (viable or otherwise) for proceeding against then-Ambassador Haley in her individual capacity. *See* J.A. 446 (the Timpsons suggesting they had a right to take then-Ambassador Haley's deposition "to determine whether she may [have] be[en] liable, in her individual capacity, for any of the claims alleged in the amended complaint").

Thus, the district court did not abuse its discretion in fashioning a direct, but limited approach to determine whether then-Ambassador Haley's deposition had any potential to lead to relevant, admissible evidence in this case. The Timpsons failed to seize on this

22

opportunity and squandered their ten interrogatories on matters unrelated to her knowledge of Johnny or decisions involving his care. Nor have they shown on appeal why then-Ambassador Haley's continued presence here is anything more than an attempt to uncover some unknown claim against her in her individual capacity. At bottom, we perceive no error in the district court's denial of this request.

## C. The SCTCA Claims

The Timpsons also challenge two aspects of the district court's jury instructions for their SCTCA claims. "We review a district court's decision to give a particular jury instruction for abuse of discretion, and review whether a jury instruction incorrectly stated the law de novo." *United States v. Miltier*, 882 F.3d 81, 89 (4th Cir. 2018) (internal citations omitted).

First, the Timpsons argue the court erred in instructing the jury that the Board and DDSN could be liable under the SCTCA only if they committed "gross negligence," that is, if they failed "to exercise slight care" or consciously failed "to do something which [was] incumbent upon [them] to do or [did] [some]thing intentionally that [they] ought not to [have] do[ne]." J.A. 3714. The Timpsons maintain that, under *Madison ex rel. Bryant v. Babcock Center, Inc.*, 638 S.E.2d 650 (S.C. 2006), the appropriate standard required the Board and DDSN to provide "reasonable care and treatment," which "may be established and defined by the common law, statutes, administrative regulations, industry standards, or a defendant's own policies and guidelines." *Id.* at 659–60. Finding no error in the district court's instruction, we affirm.

23

The SCTCA "governs all tort claims against governmental entities and is the exclusive civil remedy available in an action against a governmental entity or its employees." *Shirley's Iron Works, Inc. v. City of Union*, 743 S.E.2d 778, 783 (S.C. 2013); *see also* S.C. Code Ann. § 15-78-20(b) ("The remedy provided by this chapter is the exclusive civil remedy available for any tort committed by a governmental entity, its employees, or its agents[.]"). To that end, the statute provides several exceptions to liability, including a provision establishing that a "governmental entity is not liable for a loss resulting from" "responsibility or duty including but not limited to supervision, protection, control, confinement, or custody of any student, patient, prisoner, inmate, or client of any governmental entity, except when the responsibility or duty is exercised in a *grossly negligent manner*." S.C. Code Ann. § 15-78-60(25) (emphasis added). Thus, as the district court correctly found, the statute expressly establishes gross negligence as the applicable standard of care for the Timpsons' claims stemming from Johnny's care in the group homes. And, as the Supreme Court of South Carolina clarified in *Etheredge v. Richland School District One*, 534 S.E.2d 275 (S.C. 2000), "[g]ross negligence is the intentional conscious failure to do something which it is incumbent upon one to do or the doing of a thing intentionally that one ought not to do. *It is the failure to exercise slight care*." *Id.* at 277 (emphasis added) (internal citations omitted).

Contrary to the Timpsons' argument, *Madison* did not change this analysis. There, the Supreme Court of South Carolina found that, by "accept[ing] the responsibility of providing care, treatment, or services to a mentally retarded or disabled client," DDSN "ha[d] a duty to exercise reasonable care in supervising the client and providing appropriate

24

care and treatment to the client." *Madison*, 638 S.E.2d at 660. But as the court made clear,

> [w]hen a governmental entity owes a duty of care to a plaintiff under the common law and other elements of negligence are shown, the *next step* is to analyze the applicability of exceptions to the waiver of immunity contained in S.C. Code Ann. § 15-78-60 which are asserted by the governmental entity.

*Id.* (emphasis added). And in proceeding to that next step—which, as quoted above, provides that a governmental agency is not liable for "responsibility or duty including but not limited to supervision, protection, control, confinement, or custody of any . . . patient . . . or client of any governmental entity, except when the responsibility or duty is exercised *in a grossly negligent manner*," S.C. Code § 15-78-60(25) (emphasis added)—the Supreme Court of South Carolina simply determined that whether DDSN had acted in a grossly negligent manner was a factual issue for the jury. It *did not*, as the Timpsons would have it, remove the gross negligence standard from the SCTCA's exceptions to the waiver of immunity provision (i.e., the second step of the analysis). Thus, the district court correctly instructed the jury as to the appropriate standard of care.

For their second SCTCA challenge, the Timpsons claim the district court erred in instructing the jury that DDSN could not be held liable unless Tiny Greer's employees were also its employees. But in *Young v. South Carolina Department of Disabilities & Special Needs*, 649 S.E.2d 488 (S.C. 2007)—the decision on which the district court relied in framing this instruction—the Supreme Court of South Carolina made clear that "[t]he plain language of the statutes and ordinances establishes the Board as a separate entity from DDSN and grants the Board the authority to hire employees." *Id.* at 491. And because "the Board has been established as a separate entity with powers and duties separate from

25

DDSN. . . , the doctrine of non-delegable duty does not apply." *Id.* at 492. In other words, DDSN is not liable for the conduct of the Board or the Board's employees (including those who work at Tiny Greer). Thus, the district court did not abuse its discretion in framing its instruction on this issue.

### D. The ADA and RA Claims

For their next point of error, the Timpsons contend the district court improperly dismissed their ADA and RA claims and wrongly excluded evidence of South Carolina's financial resources. *See generally Olmstead*, 527 U.S. at 603, 607 ("[T]he resources available to the State and the needs of others with mental disabilities" may be considered in determining whether providing requested services would "entail a fundamental alteration of the State's services and programs." (alterations and internal quotation marks omitted)).

For context, the RA provides, "No otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a). Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." 42 U.S.C. § 12132. Title II defines "public entity" as, *inter alia*, "any State or local government" or "any department, agency, [or] special purpose district." *Id.* § 12131(1). "To the extent possible, we construe the ADA and [RA] to impose similar requirements. Thus, despite the

26

different language these statutes employ, they require a plaintiff to demonstrate the same elements to establish liability." *Halpern v. Wake Forest Univ. Health Scis.*, 669 F.3d 454, 461 (4th Cir. 2012) (internal citations omitted).

We need not reach the merits of the Timpsons' claims, however, because their opening brief on this issue—much like their amended complaint below—fails to identify: (1) either the specific conduct complained of or which Defendant allegedly engaged in any given unlawful action; (2) how that conduct injured either Johnny or Sandra; or (3) how that conduct violated either statute. Nor do the Timpsons present any argument that they were harmed by the dismissal of their RA claims. Thus, they have presented no basis for reversing the judgment below, *Carter v. Lee*, 283 F.3d 240, 252 n.11 (4th Cir. 2002) ("[T]his Court normally views contentions not raised in an opening brief to be waived."), and have "failed to point to persuasive indications that any one of [their] bases for reversal of the district court's judgment has merit," *First Pros. Ins. Co. v. Sutton*, 607 F. App'x 276, 290 (4th Cir. 2015) (unpublished).

The Timpsons' appeal to *Olmstead* is also unavailing. A state that decides to provide services under the Medicaid Act must do so "in the most integrated setting appropriate to the needs of qualified individuals." 28 C.F.R. § 35.130(d). But "the State generally may rely on the reasonable assessments of its own professionals in determining whether an individual meets the essential eligibility requirements for habilitation in a community-based program. Absent such qualification, it would be inappropriate to remove a patient from the more restrictive setting." *Olmstead*, 527 U.S. at 602 (internal quotation marks omitted). The Supreme Court expressly did not hold "that the ADA imposes on the States

27

a standard of care for whatever medical services they render, or that the ADA requires States to provide a certain level of benefits to individuals with disabilities." *Id.* at 603 n.14 (internal quotation marks omitted). And the Timpsons made no showing or assertion in their opening brief as to how South Carolina's purportedly improper diversion of funds had any effect on Johnny's treatment and care. *See Carter*, 283 F.3d at 252 n.11. We therefore affirm on this ground as well.

## E. The § 1983 Claims

Finally, the Timpsons argue that the district court erred by excluding evidence of Defendants' alleged § 1983 violations and ruling that any official who lacked knowledge of Johnny or the Board-operated groups homes in which he resided could not be held liable for the wrongdoing of that officials' subordinates. Missing from the Timpsons' argument, however, is the long-recognized principle that there is no doctrine of respondeat superior under § 1983. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 691–94 (1978); *see also Slakan v. Porter*, 737 F.2d 368, 372 (4th Cir. 1984) (reasoning that liability is premised not on respondeat superior but on "a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care").

Public administrators (such as the individual Defendants here) may be liable in their individual capacities only for their personal wrongdoing or supervisory actions that violated constitutional norms. *Shaw v. Stroud*, 13 F.3d 791, 799 (4th Cir. 1994). A plaintiff must satisfy three elements to establish supervisory liability under § 1983:

28

(1) that the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) that the supervisor's response to that knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) that there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff.

*Id.* (internal quotation marks omitted).

Establishing a "pervasive and unreasonable" risk of harm under the first element "requires evidence that the conduct is widespread, or at least has been used on several different occasions and that the conduct engaged in by the subordinate poses an unreasonable risk of harm of constitutional injury." *Id.* To prove "deliberate indifference" under the second element, the plaintiff typically must show a supervisor's "continued inaction in the face of documented widespread abuses." *Slakan*, 737 F.2d at 373. The plaintiff assumes a heavy burden of proof on this point because, ordinarily, he cannot satisfy it

by pointing to a single incident or isolated incidents, for a supervisor cannot be expected to promulgate rules and procedures covering every conceivable occurrence within the area of his responsibilities. Nor can he reasonably be expected to guard against the deliberate criminal acts of his properly trained employees when he has no basis upon which to anticipate the misconduct.

*Id.* at 373 (internal citation omitted). Finally, under the third element, causation is established when the plaintiff proves "an affirmative causal link"—a concept quasi-analogous to proximate cause—between the supervisor's inaction and the harm suffered. *Id.* at 376.

29

Against this backdrop, the Timpsons have failed to show reversible error. They neither pleaded nor proved any action or inaction by any of the individually named Defendants that caused them harm. Indeed, the Timpsons' § 1983 claim did not mention six of the ten individual Defendants by name. And the four they did mention were referenced only once, in a boilerplate statement that alleged no wrongdoing. *See* J.A. 275 ("These practices are so permanent and well settled as to constitute custom or usage with the force of law and the Defendants Haley, Danielson, Buscemi and Soura are persons who have final policymaking authority." (internal quotation marks omitted)). Nor did the Timpsons make any evidentiary showing of personal involvement by any individual in any complained-of action in response to Defendants' motion for summary judgment. *See* J.A. 4148 ("As to the merits of Plaintiffs' Section 1983 claims, the [c]ourt granted summary judgment and directed verdicts because the Plaintiffs offered no actual evidence that any officials violated the Constitution.").

And the Timpsons made no substantive argument to the contrary in their opening brief. *See* Opening Br. 59 ("Haley, McMaster, Soura, Buscemi and Thompson are liable for violations committed by their subordinates because they were empowered to propose rules and regulations for the government of the State system and they shouldered specific responsibility for classifying facilities and developing programs so as to permit the proper segregation and treatment of participants according to their character and mental condition." (cleaned up)). We have affirmed a district court's decision denying a plaintiff's request to add defendants when he "failed to allege facts sufficient to demonstrate any personal or supervisory wrongdoing by the administrators." *Clark v. Md. Dep't of Pub.*

30

*Safety & Corr. Servs.*, 316 F. App'x 279, 282 (4th Cir. 2009) (per curiam); *see Shaw*, 13 F.3d at 799. We similarly affirmed a grant of summary judgment when the plaintiff "failed to allege any specific wrongful action on the part of" a supervisor. *Clark*, 316 F. App'x at 282; *Slakan*, 737 F.2d at 376. This case is no different. The Timpsons made no showing of liability for acts by any of the individual Defendants.

Finally, as to the agency Defendants, the Supreme Court has made clear that "neither a State nor its officials acting in their official capacities are 'persons' under § 1983." *Will v. Mich. Dep't of State Police*, 491 U.S. 58, 71 (1989). As a result, the district court properly entered judgment in their favor. And the Timpsons have offered no justification (persuasive or otherwise) to reverse. *See Carter*, 283 F.3d at 252 n.11.

## III.

For these reasons, the district court's judgment is

*AFFIRMED IN PART,*
*VACATED IN PART,*
*AND REMANDED.*